### Paul DORN, Plaintiff,

v.

### John E. POTTER,[1] Post Master General, U.S. Postal Service (Allegheny Mid–Atlantic Areas Agency), Defendant.

### Civil Action No. 00–448.

United States District Court, W.D. Pennsylvania.

Feb. 28, 2002.

---

1. John E. Potter has succeeded William Henderson as Postmaster General and, therefore, is properly substituted as a defendant in this matter. *See* Fed.R.Civ.P. 25(d)(1).

Lois Glanby, McMurray, PA, for plaintiff.

Laura Schleich Irwin, United States Attorney's Office, Pittsburgh, PA, Jennifer S. Breslin, United States Postal Service, Office of Field Legal Services, Philadelphia, PA, for defendants.

## MEMORANDUM

LANCASTER, District Judge.

This is an action in employment discrimination. Plaintiff, Paul Dorn, alleges that he was subjected to a hostile work environment and eventually discharged from his employment with the United States Postal Service because of his disability in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Rehabilitation Act"). Plaintiff seeks money damages.

Defendant has filed a motion for summary judgment, arguing, *inter alia*, that the undisputed material facts show that plaintiff was not disabled under the law.

For the reasons set forth below, defendant's motion will be granted.

## I. BACKGROUND

■ Unless otherwise specifically indicated, the following material facts are undisputed.[2]

2. As a threshold matter, plaintiff argues that the court should not consider any of the transcript of plaintiff's deposition taken by defendant. This contention is without merit. First, plaintiff maintains that the length of his deposition exceeded the limits set forth in the Federal Rules of Civil Procedure. Plaintiff's counsel, however, never raised this issue at any time during the deposition itself and, therefore, this objection is waived. Second, plaintiff complains that he was "quite easily misled into misstating his testimony." This position ignores that fact that defendant provided plaintiff with the typical instructions at the beginning of the deposition, including an instruction that if he did not understand a question, he should so state. Plaintiff also ignores the role of his counsel at the deposition to object on the record or to take any other step permitted by the Federal Rules in order to protect and serve her client. Plaintiff points to no such objections in his opposition. Third, plaintiff argues that he was denied an "adequate opportunity to correct the transcripts." This contention is likewise without merit. Plaintiff made the choice not to purchase the transcript. Although plaintiff contends he could not afford to purchase the transcript, the court reporting service offered plaintiff ample alternatives to purchasing the transcript such as reviewing the transcript in the court reporter's offices. Interestingly, plaintiff was able to afford to have his counsel subsequently take his own deposition. The court also notes that plaintiff cites to the deposition testimony taken by defendant

### A. *Plaintiff's Alleged Disabilities*

Plaintiff is twenty-nine years old. He contends that he suffers from three disabilities: a speech impediment, a learning disability, and a back injury he sustained the day defendant terminated his employment.

Plaintiff's speech impediment is a problem with pronunciation. Specifically, plaintiff does not roll his tongue correctly and does not pronounce the letters "S" and "R" correctly. Plaintiff contends that his speech impediment is obvious and that, as a result, people often have a difficult time understanding him.

Plaintiff cannot recall the last time he went to a doctor about his speech impediment. He thought it was probably seven or eight years ago when he saw an allergist. The last time plaintiff underwent speech therapy was approximately fifteen years ago. Plaintiff is not sure whether he has informed his current primary care physician about his speech impediment. When asked if he had any present plans to see any doctors about his speech problems, plaintiff responded that he might in the future. No doctor ever informed plaintiff of any restrictions or limitations due to his speech impediment.

Plaintiff is able to use a regular, unmodified telephone at home and at all of the jobs he has had. He can call people up on the telephone and have them understand him. Sometimes, people ask plaintiff to repeat things or say they cannot understand him. According to plaintiff, his speech impediment has only affected his ability to get telemarketing jobs; it hasn't affected his ability to get other jobs. Plaintiff also testified that his speech impediment has not affected any of his hobbies or his ability to run and maintain his household.

Plaintiff's alleged learning difficulties involve learning and written and oral comprehension. Plaintiff sometimes does not comprehend what people are saying to him and what takes some people minutes to understand may take plaintiff several hours to understand. Plaintiff could not identify a specific doctor that informed him of having a learning disability, and it has been at least five years since he has seen a doctor on this issue. Plaintiff's most recent testing for having a learning disability was about ten or fifteen years ago, possibly when he was in middle school. Plaintiff could not remember the name of the doctor who performed this testing. No doctor has ever limited plaintiff's activities due to his learning difficulties, nor has plaintiff ever been prescribed any medication or treatment for this problem. Plaintiff has no plans to go to a doctor about his learning problem.

Plaintiff testified at his deposition that other than paying bills (which his wife does), his learning difficulties do not affect his ability to run his household. Plaintiff now contends that due to his learning disability, he cannot balance a checkbook, complete the weekly grocery shopping, or remember to perform various tasks. His learning problem also has somewhat affected his hobby of drawing, but otherwise his hobbies are not affected.

Plaintiff contends that he suffered a back injury on August 13, 1998, when he was struck by a motorized cart at the postal facility where he worked for defendant. Plaintiff had no prior injuries to his back. Plaintiff had difficulty with just about everything for approximately six to eight months after his back injury, but now is able to do many things such as showering. Plaintiff also can walk about one mile, lift about 50–75 pounds, bench press 100 pounds, sit in a chair for approx-

when he feels it supports his arguments. Plaintiff cannot have it both ways.

imately two hours and stand for two hours without pain. Plaintiff contends that he cannot move heavy objects such as furniture or exercise to keep physically fit. He also claims to continue to experience back pain when, for example, the weather changes. In addition, plaintiff alleges that his ability to perform sexually, although improved, is not what it used to be prior to his back injury.

At the time of his first day of deposition testimony (August 30, 2001), plaintiff's typical day involved setting his alarm clock to get himself up in the morning, waking, showering, packing his own lunch, and taking the bus to work by himself. Plaintiff also performs odd jobs around the house such as remodeling his home, household repairs (e.g., plumbing and fixing the washing machine, shower, and dishwasher), some cleaning (e.g., dusting, sweeping, mopping the floor, vacuuming, and washing windows), and cooking. Plaintiff also performs outdoor chores such as mowing the lawn, shoveling the sidewalk, and performing outside maintenance.

Plaintiff has had a driver's license since he was nineteen years old. One of plaintiff's hobbies is taking long drives during which he likes to get lost intentionally and then find his way home. Plaintiff testified that his hobbies also have included weightlifting, wrestling, football, drawing, slot machines, and computer games, although he contends he can no longer do things such as lift weights or exercise due to his back injury. Plaintiff also enjoys reading wrestling magazines, mysteries, and joke books. He stated that the reading material must be interesting because he gets bored very easily.

Plaintiff chose to leave high school without graduating because he got tired of other students picking on him because of his speech and learning problems and he wanted to get into the "real world" and earn money. Plaintiff studied for and passed the G.E.D. exam on his first attempt. Plaintiff could not recall having any special or additional instruction with regard to his speech impediment or learning problems when studying for the G.E.D. After earning his G.E.D. and getting bored with his then-current job, plaintiff applied on his own to the Community College of Allegheny County ("CCAC") and studied welding. Plaintiff did not complete the program due to financial difficulties. Plaintiff earned the highest score available in all his welding courses and did not have any special classes due to his speech or learning problems.

### B. Plaintiff's Employment History

Prior to working for defendant, plaintiff held the following jobs: neighborhood handyman (i.e., cutting grass, handyman work, painting, fixing screen doors, fixing small appliances, and fixing furniture); dishwasher at various establishments; construction laborer; and valet at Children's Hospital. Plaintiff was laid off by Children's Hospital. Otherwise, he left each of his jobs voluntarily and was not fired from any of them. Plaintiff's feedback from employers has never indicated any major problems with plaintiff's work.

Plaintiff worked for defendant on two separate occasions as a casual employee. Casual employees are hired on a temporary basis to supplement the workforce during high volume and/or high vacation times (such as Christmas or the summer months). Casual employees are not union members and enjoy none of the benefits of union membership. Because casual employees supplement the regular workforce and are generally hired during high volume and/or high vacation times, regular attendance is an essential function of the job of a casual employee. Because they are a supplement to the regular work force, casual employees do not have a fixed

schedule. Rather, they are used on an "as needed" basis. Casual employees are hired to perform either mailhandler or clerk functions.

Plaintiff received a copy of the terms of casual employment, and he understood that his appointment as a casual employee was for a specific length of time. He also understood that he would have a supervisor and would be working as frequently as twelve hours a day, seven days a week. During orientation, defendant informed plaintiff that, as a casual employee, he was not entitled to any sick leave, paid vacation, or benefits. Plaintiff also understood that defendant, as the employer, was the one to set his hours. Plaintiff understood that it was important that he be regular in attendance and that if his attendance was not regular, his employment could be terminated.

On his medical examination and history form, plaintiff did not indicate that he had a speech impediment or that he was slow and had a learning problem. On the "General Information Sheet" he completed, he indicated that he did not have any medical problems that should be evaluated prior to his employment with defendant. When plaintiff went for his Postal Service medical examination, he told the physician that he "had a speech problem where people don't understand me." Plaintiff did not speak to the physician about being slow and having a learning problem. On the medical forms, the postal physician did not indicate any abnormalities, significant findings, limitations, or restrictions with respect to plaintiff.

Plaintiff had two appointments as a casual employee with defendant. Plaintiff's first casual appointment began November 7, 1997 and ended as a matter of course on January 2, 1998. Plaintiff was absent from work on five occasions during this first appointment.

In between his first and second casual appointments with defendant, plaintiff worked as a telephone solicitor with Reese Brothers, a company that raises money for different entities. Plaintiff's position involved calling people on the telephone, identifying himself, reading from a prepared script, and asking for a donation. All telephone operators at Reese Brothers, including plaintiff, were monitored for quality assurance. Plaintiff left Reese Brothers voluntarily to begin his second casual appointment with defendant.

Plaintiff's second casual appointment started on June 20, 1998, with a December 15, 1998 ending date. Plaintiff left the employ of defendant on July 25, 1998 and was rehired on August 1, 1998. At this time, his appointment was set to expire on December 31, 1998. Plaintiff's work performance during his second appointment was between good and excellent and there was no part of his job as a casual employee he could not perform.

During his second casual appointment, plaintiff was four hours late on July 3, 1998 and one-tenth of an hour late on July 21, 1998. He also called off on July 6, 7, 8, and 9, 1998 and called off for eight hours on July 10, 1998. All of these late arrivals and absences occurred before he left and was rehired on August 1, 1998. Neither his speech impediment nor his being slow and having a learning problem had anything to do with plaintiff's absences during his second appointment.

Plaintiff's speech impediment did not affect his work performance. Plaintiff maintains that he told people about being slow and having a learning disability by saying "you better give me a little clarification, because I'm not going to be able to comprehend it immediately." He had to ask for multiple instructions on some, but not all, of the tasks assigned to him. He also testified that his learning disability became

apparent on the job when he needed help "learning something over and over again." Plaintiff overcame these obstacles, however, and did not let his learning disability affect his job performance.

Beginning on August 1, 1998, plaintiff was assigned to "Tour 2" which began at 5:00 a.m. and ended at 5:00 p.m. Raymond Ninehouser was the casual coordinator for Tour 2, and Dan Pavasko was plaintiff's immediate supervisor. As casual coordinator, Mr. Ninehouser was responsible for monitoring casual employees' attendance and responding to other supervisors' concerns about such attendance. Mr. Ninehouser also was responsible for discharging casual employees, should he deem such discharge necessary.

Mr. Pavasko testified that he considered plaintiff to be a good, enthusiastic worker and that he never had any problem with plaintiff's work performance. Mr. Pavasko noticed that plaintiff had a speech impediment but testified that he never had any appreciable difficulty understanding plaintiff's speech. Mr. Pavasko also testified that he believed plaintiff was slightly slow in certain areas but picked up on some things rather quickly. Mr. Pavasko could not recall having any noticeable difficulty in conveying assignments and information to plaintiff or having concerns about plaintiff's ability to perform the tasks required of a casual employee. Mr. Pavasko stated that he would not have a problem with plaintiff returning to work for defendant if not for his absenteeism. Mr. Ninehouser stated that he cannot recall having any noticeable difficulty in understanding plaintiff's spoken words or in conveying assignments and information to plaintiff.

During plaintiff's second casual appointment, he overheard someone saying that he had a speech impediment, but he could not remember who said this or when it was said. Plaintiff also testified that others, whom he could not identify, made jokes about his speech impediment. Other than these comments, plaintiff could not recall any other comments made by anyone at the postal facility about his speech impediment.

Plaintiff maintains that one time when he asked Mr. Pavasko for additional help, Mr. Pavasko said to another person, whose name plaintiff could not recall, something along the lines of "that dude is retarded." Mr. Pavasko did not make this comment to plaintiff, but plaintiff believes it was directed to him because of the way Mr. Pavasko looked at plaintiff. Plaintiff also maintains that Mr. Pavasko said in front of others "watch out for [Mr. Dorn]; [Mr. Dorn] isn't up to speed," but plaintiff could not recall the date of this incident or the name of the person to whom the comment was made. Plaintiff further maintains that several other times he was teased about being slow and having a learning problem.

Defendant terminated plaintiff's employment on August 13, 1998. Defendant contends that plaintiff reported to work late that morning and, after reviewing his file, Mr. Ninehouser decided to discharge him for excessive absenteeism. Plaintiff contends that Mr. Pavasko made the decision to discharge him because he sustained a work-related back injury when he was struck by a motorized cart earlier that day.

From June, 1999 to August, 1999, plaintiff worked full time as a customer service representative for Echo Star, a satellite cable company that sells and services satellite dishes and provides programming for cable services. Plaintiff's job as a customer service representative involved talking to customers and potential customers on the telephone, taking as many as twenty calls a day, and entering data into a computer. The nature of these calls included sales calls, technical calls, billing calls, and programing calls.

Plaintiff received pay raises and average reviews at Echo Star. When asked if anyone had complained about his work at Echo Star, Plaintiff stated that he received criticism one time because he swore and another time because he was mean to an installer.

In approximately August 2000, plaintiff began a part-time job at Wal–Mart in a position which involved assembly of toys and furniture (which required him to read, comprehend, and follow written instructions), stocking shelves, customer assistance, and whatever else was asked of him. During the time he worked at Echo Star, plaintiff worked sixteen to twenty hours at Wal–Mart and generally could have worked more if he wanted. When plaintiff voluntarily resigned his position at Echo Star, he became a full-time employee at Wal–Mart. As of February, 2002 plaintiff's job at Wal–Mart involved working more as a "floater," doing whatever needed to be done, including mixing paint for customers, completing simple paperwork regarding broken or stolen items, and assisting customers in locating items throughout the store. Plaintiff works overtime at Wal–Mart depending on whether he feels like working overtime and whether it is available.

## II. STANDARD OF REVIEW

The court will grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material" only if it might affect the outcome of the case under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Factual disputes concerning issues that are irrelevant to the outcome of the case are, therefore, not considered. Id.

Factual disputes must also be "genuine" in that the evidence presented must be such "that a reasonable jury could return a verdict for the nonmoving party." Id.

A non-moving party may not successfully oppose a summary judgment motion by resting upon mere allegations or denials contained in the pleadings, or by simply reiterating those allegations or denials in an affidavit. Lujan v. National Wildlife Fed'n, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). Rather, the non-moving party must offer specific evidence found in the record that contradicts the evidence presented by the movant and indicates that there remain relevant factual disputes that must be resolved at trial. See id. If the non-moving party does not respond in this manner, the court, when appropriate, shall grant summary judgment. Fed.R.Civ.P. 56(e).

With these concepts in mind, the court turns to the merits of defendant's motion.

## III. DISCUSSION

Defendant asserts a number of bases in support of his motion for summary judgment. One of these grounds is that plaintiff does not have a disability as defined by the Rehabilitation Act. Because we agree with defendant that plaintiff is not disabled, and, therefore, is not protected by the Rehabilitation Act, we need not address defendant's alternate arguments. Defendant's motion for summary judgment will be granted.

 To show a violation of the Rehabilitation Act, a plaintiff must first establish a prima facie case of discrimination. See, e.g., McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir.1999); 29 U.S.C. § 791 et seq. To establish a prima facie case under a disparate treatment theory, a plaintiff must show:

(1) that he has a disability;

(2) that he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and

(3) that he nonetheless suffered an adverse employment action as a result of discrimination.

*Shiring v. Runyon,* 90 F.3d 827, 831 (3d Cir.1996). Here, plaintiff cannot establish the first prong of this test, that he has a disability within the meaning of the Rehabilitation Act.[3]

Under the Rehabilitation Act, an "individual with a disability" is any person who:

(i) has a physical or mental impairment which substantially limits one or more of such person's major life activities;

(ii) has a record of such an impairment; or

(iii) is regarded as having such an impairment.

29 U.S.C. § 705(20)(B).

 In order to qualify as disabled under the first subsection of the definition of disability, a plaintiff must initially prove that he or she has a physical or mental impairment. *Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184, 122 S.Ct. 681, 690, 151 L.Ed.2d 615 (2002).[4] Merely having an impairment, however, does not make one disabled for purposes of the law. *Id.* Rather, plaintiffs "also need to demonstrate that the impairment limits a major life activity." *Id.* The regulations promul-

gated pursuant to the Rehabilitation Act provide a list of examples of "major life activities," including: caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. 45 C.F.R. § 84.3(j)(2)(ii). To prove disability, a plaintiff "must further show that the limitation on the major life activity is 'substantia[l].' " *Toyota Motor Mfg., Ky., Inc.,* 534 U.S. at 184, 122 S.Ct. at 690 (quoting 42 U.S.C. § 12102(A)) (alteration in original).

 The word "substantial" in the phrase "substantially limits" "clearly precludes impairments that interfere in only a minor way with performance of [a major life activity] from qualifying as disabilities." *Id.* at 691; *see also Albertson's, Inc. v. Kirkingburg,* 527 U.S. 555, 565, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999) (explaining that a "mere difference" does not amount to a "significant restric[tion]" on a major life activity). Moreover, the phrase "major life activities" refers only "to those activities that are of central importance to daily life." *Toyota Motor Mfg., Ky., Inc.,* 122 S.Ct. at 691. As the Supreme Court recently explained in *Toyota Motor Manufacturing, Kentucky, Inc.,* congressional intent dictates that "these terms need to be interpreted strictly to create a demanding standard for qualifying as disabled." *Id.* at 691. Therefore, to be substantially limited in a major life activity:

---

**3.** Plaintiff also must show he had a disability to proceed under his hostile work environment theory. *See Walton v. Mental Health Ass'n of Southeastern Pa.,* 168 F.3d 661, 667 (3d Cir.1999).

**4.** Although *Toyota Motor Manufacturing, Kentucky, Inc.* was a case interpreting the Americans with Disabilities Act ("ADA"), "[t]he elements of a claim under § 504(a) of the Rehabilitation Act are very similar to the elements of a claim under the [ADA]." *Donahue v. Consol. Rail Corp.,* 224 F.3d 226, 229

(3d Cir.2000); *see also* 29 U.S.C. § 794(d) ("The standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under Title I of the Americans with Disabilities Act of 1990 (42 U.S.C. § 12111 *et seq.*) and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990 (42 U.S.C. §§ 12201 to 12204 and 12210), as such sections relate to employment.").

an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives. The impairment's impact must also be permanent or long-term. *Id.* (citing 29 C.F.R. § 1630.2(j)(2)(ii)-(iii)).

 Courts must determine whether an individual has a disability on a case-by-case basis. *See id.* at 692; *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 483, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). Thus,

> [i]t is insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment. Instead, [plaintiffs must] "prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience . . . is substantial."

*Toyota Motor Mfg., Ky., Inc.,* 122 S.Ct. at 691–92 (quoting *Albertson's, Inc.,* 527 U.S. at 567, 119 S.Ct. 2162) (third and fourth alterations in original).

Here, plaintiff asserts that he suffers from three disabling conditions: a speech impediment; a learning disability; and a back injury that he suffered on his last day of employment with defendant. None of these conditions rises to the level of a "disability" under the law.

 First, the record evidence establishes that plaintiff's speech impediment does not substantially limit any major life activity, including that of speaking. Most notably, plaintiff successfully held positions both before and after his employment with defendant that involved extensive use of speech over an unmodified telephone, including the position of telephone solicitor for Reese Brothers and customer service representative for Echo Star. Plaintiff also testified that he is able to use a regular, unmodified telephone at home. The court also notes that plaintiff was able to speak

intelligibly throughout four days of deposition testimony. *See Reeder v. Frank,* 813 F.Supp. 773, 781 (D.Utah 1992) (rejecting plaintiff's claim that his speech impediment was a disability where, *inter alia,* plaintiff was able to speak intelligibly for approximately seven hours during his deposition), *aff'd,* 986 F.2d 1428, 1993 WL 34775 (10th Cir.1993). Moreover, plaintiff testified that his speech impediment has not affected any of his hobbies or his ability to run and maintain his household.

In addition, plaintiff testified that he has no present plans for treatment of his speech impediment and could not recall visiting a doctor for treatment of his speech impediment within the last eight years. Indeed, plaintiff could not recall receiving any treatment for his speech impediment other than speech therapy fifteen years ago. No physician ever informed plaintiff of any restrictions due to his speech impediment. Moreover, plaintiff did not inform defendant of his alleged speech impediment in his application papers even though he understood the importance of communication to the job. *See Reeder,* 813 F.Supp. at 781 (noting that plaintiff never officially declared his speech disorder when applying for employment with the Postal Service). He also maintains that his speech impediment did not affect his performance during his employment with defendant and that his performance was between good and excellent. The record evidence shows that defendant agrees with plaintiff's assessment of his job performance.

In short, the record evidence, including plaintiff's own testimony establishes that his speech impediment, even if an impairment, does not substantially limit any major life activities. Therefore, plaintiff's speech impediment is not a disability under the Rehabilitation Act.

■ Likewise, plaintiff has failed to show that his alleged learning disability substantially limits a major life activity, including the activity of learning itself. For example, plaintiff's testimony regarding the breadth and depth of his hobbies (reading, small appliance repair, etc.) and the nature and successes of his employment demonstrates his lack of a substantially limiting impairment of any sort. Indeed, plaintiff has held a wide variety of jobs requiring detailed thought processes and his employment has never been terminated for performance reasons. With the exception of drawing, plaintiff's alleged learning disability also has not affected his hobbies.

Plaintiff's educational background also belies his contention that his alleged "lifelong" learning disability substantially limits any major life activity. Significantly, plaintiff applied on his own and completed his G.E.D. (passing the exam on the first try) without any special assistance due to having a learning disability. Moreover, plaintiff applied on his own to Community College of Allegheny County where he received the highest grade possible in the welding classes he took. Again, plaintiff received no special assistance for having a learning disability.

■ Significantly, plaintiff cannot identify any specific doctor that has diagnosed him with this alleged learning disability and the last time he sought treatment was five years ago. He last sought testing for the problem ten to fifteen years ago (possibly in middle school) and could not recall the name of that doctor. No doctor ever informed plaintiff of any restrictions or limitations due to his alleged learning

problems, and plaintiff has no plans to see a physician about his problem. Although medical evidence is not required to prove a disability in all cases,[5] the absence of medical evidence of an impairment is a factor cutting against a plaintiff's claim of disability. *See Marinelli v. City of Erie*, 216 F.3d 354, 360–61 (3d Cir.2000). The lack of medical evidence is especially damaging in this case given the other weaknesses in plaintiff's claim of disability as described above. *See id.* at 361.

Indeed, the only evidence plaintiff points to other than the unsupported, self-serving declarations of himself and his wife, is his transcripts from middle school and high school which he has attached as exhibits in support of his opposition to the instant motion. Even if proper evidence,[6] these records do not support a conclusion that plaintiff was substantially limited in any major life activity at the time of the alleged adverse employment actions at issue. *See, e.g., Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 508 (7th Cir.1998) (noting that plaintiff's evidence concerning her past difficulties in school was not evidence that her learning disability presently limited her capacity to learn). If anything, plaintiff's school records cut against his disability claim. For example, the records show that plaintiff passed all his classes in sixth grade, failed only one class in seventh and eighth grade, and passed four out of nine classes in ninth grade despite a significant number of absences and late arrivals each school year. Indeed, the records do nothing to prove that plaintiff's poor grades were the result of a learning disability as opposed to other factors such as his numerous absences from school.

---

5. The necessity of medical testimony "turns on the extent to which the alleged impairment is within the comprehension of a jury that does not possess a command of medical or otherwise scientific knowledge." *Marinelli v. City of Erie*, 216 F.3d 354, 360 (3d Cir.2000).

6. The government argues that plaintiff's school records do not comply with the requirements of Fed.R.Civ.P. 56(e) and, therefore, should not be considered in support of plaintiff's position.

Aside from the activity of learning itself, plaintiff claims that his learning disability substantially impairs his ability to perform activities such as balancing a checkbook, doing the weekly grocery shopping, and remembering to perform various unspecified tasks. Even if true, however, these are not severe restrictions on plaintiff's major life activities within the meaning of the Rehabilitation Act. *See, e.g., Toyota Motor Mfg., Ky., Inc.,* 122 S.Ct. at 694 (noting that the fact that plaintiff's medical conditions caused her to avoid sweeping, quit dancing, occasionally seek help dressing, and reduce how often she played with her children, gardened, or drove long distances did not amount to such severe restrictions in the activities that are of central importance to most people's daily lives that they establish a manual-task disability as a matter of law).

In short, plaintiff has failed to show any link between his school records and his alleged learning disability or to point to any other record evidence whatsoever supporting this disability claim. If anything, the record evidence shows that plaintiff's alleged learning difficulties have not substantially limited any major life activities. For these reasons, the court finds that plaintiff's alleged learning disability does not rise to the level of a legal disability within the meaning of the Rehabilitation Act.

Finally, plaintiff's back injury also does not qualify as a disability under the Rehabilitation Act. Most significantly, the record evidence establishes that plaintiff's back injury was temporary in nature and, therefore, does not constitute a covered disability as a matter of law. *See Toyota Motor Mfg., Ky., Inc.,* 122 S.Ct. at 691. In particular, plaintiff testified that he suffered the back injury in a work-related accident on August 13, 1998 and that he suffered significant residual problems from that injury for approximately eight months. Plaintiff, however, further testified that he has returned to many of his normal activities. For example, plaintiff can shower, walk about one mile, lift about 50–75 pounds, bench press 100 pounds, sit in a chair for approximately two hours and stand for two hours without pain. Plaintiff also has worked full time since his back injury, including working two jobs at once and working overtime. Although plaintiff contends that he is unable to move heavy objects such as furniture or exercise to keep physically fit, and that his ability to perform sexually, although improved, is not what it used to be prior to his injury, these are not severe limitations on major life activities contemplated by the Rehabilitation Act.[7]

In short, plaintiff has not supplied any evidence indicating that his back injury was permanent in or that it substantially limits any major life activity. The mere

7. The only medical "evidence" of his back injury plaintiff submitted in support of his opposition to defendant's motion consists of two one-page hospital records. Even if proper under Fed.R.Civ.P. 56(e), these records do nothing to support plaintiff's position. Although the first record indicates plaintiff was diagnosed with a disc herniation, it in no way indicates whether or how this herniation impaired any of plaintiff's activities. Moreover, the record indicates that plaintiff's own physician questioned plaintiff's veracity. *See* Exhibit D to Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("At this point his clinical symptoms is [sic] not clinically correlated. The patient claims to have numbness of left buttocks to the left lower leg but the herniation is on the right side so I don't know whether the patient is telling the truth or just has a secondary gain."). The second record simply reports the undisputed fact that plaintiff underwent a therapeutic lumbar epidural block in December, 1998. Again, the record nowhere discusses any limitations on plaintiff's activities caused by his back injury.

averments of plaintiff and his wife to the contrary are insufficient to survive defendant's motion for summary judgment.

 Plaintiff alternatively argues that, even if he is not actually disabled, defendant regarded him as disabled in violation of the Rehabilitation Act. To prevail under a "regarded as" theory, however, plaintiff must demonstrate either that (1) despite having no impairment at all, defendant erroneously believes he has an impairment that substantially limits a major life activity or (2) he has a nonlimiting impairment that the employer mistakenly believes substantially limits a major life activity. *See Tice v. Centre Area Trans. Auth.,* 247 F.3d 506, 514 (3d Cir.2001). In either case, it is not sufficient to show that defendant regarded plaintiff as having an impairment; rather, defendant must have regarded plaintiff as having a *substantially limiting* impairment. *See Deane v. Pocono Med. Ctr.,* 142 F.3d 138, 143 (3d Cir.1998); *Tice,* 247 F.3d at 514.

 Here, plaintiff has failed to meet this burden. With respect to plaintiff's speech impediment, plaintiff's supervisor, Mr. Pavasko, testified that, although he noticed a slight speech impediment, he did not experience any noticeable difficulty in understanding plaintiff's speech. Mr. Ninehouser also testified that he had no noticeable difficulty in understanding plaintiff's speech. Moreover, it is undisputed that defendant had no problems with plaintiff's work performance. Similarly, there is no evidence of record that defendant regarded plaintiff as having a substantially limiting learning disability. Consideration of plaintiff's allegation that co-workers made comments to him about his speech and about being slow does not change this conclusion. Even if true, these comments at most show that defendant regarded plaintiff as having an impairment. They in no way indicate that defendant viewed plaintiff as having an impairment that sub-

stantially limited a major life activity. *See Kelly v. Drexel Univ.,* 94 F.3d 102, 109 (3d Cir.1996).

Finally, the undisputed facts establish that plaintiff did not regard plaintiff as having a disabling back injury at the time of the adverse employment actions at issue. Importantly, plaintiff admits that after sustaining the injury, he told Mr. Pavasko that he was not badly hurt. Plaintiff likewise does not contend that Mr. Ninehouser knew of his back injury. If anything, this evidence shows that defendant regarded plaintiff as not disabled.

## IV. CONCLUSION

Plaintiff has failed to place on the record evidence by which a jury acting reasonably could conclude that he suffered from a disability within the meaning of the Rehabilitation Act. Defendant's motion for summary judgment is granted. The appropriate order follows.

### ORDER

AND NOW, this 28th day of February, 2002, upon consideration of defendant's motion for summary judgment, IT IS HEREBY ORDERED that the motion is GRANTED. The Clerk of Courts is ordered to mark this case closed.