**Robin L. PETER, Plaintiff**

v.

**LINCOLN TECHNICAL INSTITUTE, Defendant**

No. 01–CV–5949.

United States District Court, E.D. Pennsylvania.

Aug. 30, 2002.

Order Denying Reconsideration Oct. 7, 2002.

Donald P. Russo, Bethlehem, PA, for Robin L. Peter.

John H. Schmidt, Jr., Lindabury, McCormick and Estabrook, Westfield, NJ, Sharon M. Erwin, Law Offices of Sharon M. Erwin, LLC, Philadelphia, PA, Robert S. Schwartz, Lindabury, McCormick and Estabrook, Westfield, NJ, for Lincoln Technical Institute, Inc.

### MEMORANDUM and ORDER

VAN ANTWERPEN, District Judge.

Plaintiff Robin L. Peter ("Peter" or "Plaintiff") brought suit against her employer Lincoln Technical Institute, Inc. ("LTI" or "Defendant") alleging that she was not offered reasonable accommodation and discriminatorily discharged on the basis of a disability in violation of the Americans With Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA") and the Pennsylvania Human Relations Act, 43 P.S. §§ 955 and 962 ("PHRA"). She further alleges that she was discharged while on disability leave, without being given an adequate opportunity to submit proper medical certification, in violation of the Family Medical Leave Act, 29 U.S.C. § 2601 et seq. ("FMLA") and retaliated against for attempting to secure her rights under the same, in violation of 29 U.S.C. § 2615(a)(2). Defendant has moved for summary judgment on all counts.

We now find that Plaintiff's claims under the ADA and PHRA are time-barred because she failed to file them within the 300–day statutory period, and that even if they were not time-barred, Plaintiff has not produced sufficient evidence to establish her prima facie case. Summary judgment is therefore granted to Defendant on counts one and four of Plaintiff's complaint. We decline to grant summary judgment with respect to Plaintiff's FMLA claims.

## I. INTRODUCTION

Our decision takes into account Plaintiff's Complaint, filed in the Court of Common Pleas of Lehigh County, Pennsylvania on November 1, 2000 and removed to this court on December 7, 2001 ("Complaint"), Defendant's Answer to Complaint with Affirmative Defenses, filed on November 30, 2001 ("Answer"), Defendant's Motion for Summary Judgment, Brief and Exhibits, filed on July 10, 2002 ("SJ Mot."),[1] Plain-

---

1. The exhibits attached to LTI's Motion for Summary Judgment include the deposition transcripts of Robin Peter (Exhibit A), Jennie Hunsicker (Exhibit H) and Liza Kuntz (Exhibit L). We will refer to these depositions in citation as, respectively, "Peter T__:__", "Hunsicker T__:__", and "Kuntz T__:__". The exhibits themselves are referred to in citation as "SJ Mot. Ex. __".

tiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, filed on August 12, 2002 ("Opp. to SJ"), and Defendant's Reply to Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Reply").

## II. STATEMENT OF JURISDICTION

We have original subject matter jurisdiction over ADA and FMLA claims under 28 U.S.C. § 1331. We consider plaintiff's PHRA claim by exercising our supplemental jurisdiction under 28 U.S.C. § 1367(a), as that claim arises out of the same operative facts and transaction with Defendant.

## III. STANDARD OF REVIEW

The court shall render summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is "material" only if it might affect the outcome of the suit under governing law. *Id.* at 248, 477 U.S. 242, 106 S.Ct. 2505. All inferences must be drawn, and all doubts resolved, in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Gans v. Mundy,* 762 F.2d 338, 341 (3d Cir.1985), *cert. denied,* 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985).

On motion for summary judgment, the moving party bears the initial burden of identifying those portions of the record that it believes demonstrate the absence of genuine dispute as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323,

106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To defeat summary judgment, the non-moving party must respond with facts of record that contradict the facts identified by the movant and may not rest on mere denials. *Id.* at 321 n. 3, 477 U.S. 317, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(e)); *see First Nat'l Bank of Pennsylvania v. Lincoln Nat'l Life Ins. Co.,* 824 F.2d 277, 282 (3d Cir.1987). The non-moving party must demonstrate the existence of evidence that would support a jury finding in its favor. *See Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505.

In discrimination and retaliation cases, proof at summary judgment follows a well-established burden-shifting approach first set forth in *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this burden-shifting approach, once a plaintiff has established a prima facie case of discrimination or retaliation, the defendant must rebut an inference of wrongdoing with evidence of a legitimate, non-discriminatory or non-retaliatory reason for the action taken. *Delli Santi v. CNA Ins. Cos.,* 88 F.3d 192, 199 (3d Cir.1996); *Weston v. Commonwealth of Pennsylvania,* 251 F.3d 420, 432 (3d Cir.2001). If a defendant successfully meets its burden in a discrimination or retaliation case, then in order to avoid summary judgment, the plaintiff must present evidence of pretext or cover-up, or show that discrimination played a role in the employer's decision making and had a determinative effect on the outcome. *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir.1994); *Weston,* 251 F.3d at 432. The ultimate burden to prove discrimination on the basis of the claimed protected class— the burden of production—remains with the plaintiff at all times. *See Barber v. CSX Distrib. Servs.,* 68 F.3d 694, 698 (3d Cir.1995).

Notwithstanding the moving party's burden, the Third Circuit urges special caution in granting summary judgment to an employer when its intent is at issue, particularly in discrimination and retaliation cases. *Goosby v. Johnson & Johnson Med., Inc.,* 228 F.3d 313, 321 (3d Cir.2000).

## IV. FACTUAL BACKGROUND

LTI employed Peter from October 6, 1994 through June 25, 1999 in the position of education clerk. Peter received generally favorable annual evaluations, but was subject to negative performance evaluations on three occasions. On November 21, 1996 and November 4, 1997, she received memoranda indicating that her job performance was unsatisfactory. On January 15, 1999, Plaintiff was placed on a one-month probation because of her lack of personal initiative, inaccuracy and low productivity.

At some time in early 1999, Peter began experiencing significant difficulty staying awake at work because she could not sleep restfully at night. She began falling asleep several times a day for a few minutes at a time, even while working at her supervisor's computer or transferring phone calls. She would wake up five or six times each night and occasionally have to get out of bed.

On May 28, 1999, Peter's immediate supervisor, Jennie Hunsicker ("Hunsicker"), called her in for a brief conference to discuss her poor work performance, absenteeism, and seeming inability to stay awake on the job. Hunsicker recommended that Peter take some time off and consult a physician about her "illness" so that LTI could determine whether Peter was eligible for disability leave. Peter's last day of work was May 28, 1999, and she

called Hunsicker on June 1 to tell her that she would be taking one month's leave of absence. At that time, Hunsicker informed her that she would need to provide medical certification of her illness in order for LTI to determine whether she was eligible for either disability or FMLA leave and provided her with the necessary forms.

Peter completed her portion of the certification forms the same day and dropped them off at her physician's office. Dr. Galgon, the treating physician, told her that he would fill them out and mail them that day. However, Dr. Galgon did not return the forms as promised. Indeed, he did not sign them until June 25, 1999 and LTI did not receive them until June 29, 1999. Between June 1 and June 25, Hunsicker contacted Peter by phone at least three times and possibly as often as twice each week to find out where the requested medical certification was. Each time that Peter spoke with Hunsicker, she informed her that she had completed her portion of the forms and given them to her doctor to complete, and that her doctor's office told her they would send them to LTI. After each call from Hunsicker, Peter called Dr. Galgon's office to ask him to complete the forms. She was unable, until June 25, 1999, to speak directly to the doctor but was assured by his staff that the forms would be "out by the end of the week."

On June 25, 1999, Hunsicker and her supervisor, Lisa Kuntz ("Kuntz"), made the determination that Peter had abandoned her job and decided to "accept her resignation."[2] Peter received a letter from LTI informing her of her termination on June 28, 1999, and immediately visited Kuntz in her office to plead for her posi-

---

**2.** Although LTI insists that Peter resigned her position by virtue of her absenteeism, it is undisputed that Peter did not intend to resign. We will therefore refer to the acceptance of Peter's resignation via abandonment as a "termination" for the remainder of this decision.

tion back. Her request was unavailing, and Peter never returned to work at LTI. The following day, LTI received Peter's UNICARE disability claim form, completed by Dr. Galgon. It indicated that Peter had been diagnosed with severe sleep apnea and severe sleepiness, had been unable to work because of this condition since June 1, 1999 and would require an "indefinite" period to recover.

On July 12, 1999, Peter filed a charge with the United States Department of Labor alleging that LTI had violated her rights under the FMLA. On July 11, 2000, she filed a charge with the Equal Employment Opportunity Commission alleging that LTI had violated her rights under the ADA. After she received her notice of right to sue, this action was commenced.

## V. DISCUSSION

A. *Timeliness of Plaintiff's ADA and PHRA Claims*

As a preliminary matter, we address the timeliness issue raised by Defendant in its Motion for Summary Judgment.

1. *Filing Requirements under the ADA*

■ In order to bring suit under the ADA, a plaintiff must have exhausted her administrative remedies by filing a timely charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). For a charge to be timely, a plaintiff must normally file her charge of discrimination with the EEOC within 180 days after the alleged unlawful employment practice took place. However, in a "deferral state" such as Pennsylvania, that is, a state which has a state or local law prohibiting the practice alleged and established or authorizing the state or local authority to grant or seek relief from practices prohibited under the ADA, the plaintiff has not 180 but 300 days from the date of the alleged unlawful employment prac-

tice in which to file her charge of discrimination with the EEOC. 42 U.S.C. § 2000e–5(e)(1) (2002); *see Seredinski v. Clifton Precision Prods. Co.,* 776 F.2d 56 (3d Cir. 1985). The extension of the filing time to 300 days is effective regardless of whether the plaintiff ever files a charge with the authorized state agency. *See Colgan v. Fisher Scientific Co.,* 935 F.2d 1407, 1414–15 (3d Cir.1991). Peter thus had 300 days from the date of the alleged unlawful practice to file her EEOC claim.

2. *Analysis of Plaintiff's ADA and PHRA claims*

Defendant argues that Peter filed her EEOC charge on July 11, 2000, more than 300 days after her termination date of June 28, 1999, and that this court therefore has no jurisdiction to hear Peter's ADA or PHRA claims.

We agree with Defendant that Plaintiff failed to file her ADA and PHRA charges with the EEOC within the 300 day window allowed by statute, and therefore grant Defendant's motion for summary judgment with respect to these claims.

■ As a preliminary matter, we note that Plaintiff makes no response, on either factual or legal grounds, in her Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment to Defendant's timeliness arguments. However, we "may not grant an uncontested summary judgment motion without making an inquiry into the merits of the moving party's motion." *Apple Corps, Ltd. v. Button Master,* No. CIV.A.96–5470, 1998 WL 126935 (E.D.Pa. Mar. 19, 1998), 1998 U.S. Dist. LEXIS 3366; U.S. Dist. Ct. E.D.Pa. L.R. Civ. P. 7.1(c); *also Shields v. Zuccarini,* No. CIV.A.00–494, 2000 WL 1056400 (E.D.Pa. Jun. 5, 2000), 2000 U.S. Dist. LEXIS 15223; *Bernhardt v. Hygrade,* No. CIV.A.96–7948, 1998 WL 401706 (E.D.Pa.

Jun. 30, 1998), 1998 U.S. Dist. LEXIS 10031.

### a. *The Statutory Calculation*

Defendant is correct that Plaintiff's failure to file an EEOC charge within 300 days of her termination is fatal to her ADA and PHRA claims.

Plaintiff signed her EEOC Charge of Discrimination on July 11, 2000. SJ Mot. Ex. P. Both parties acknowledge this to be the date her charge was filed. Defendant's Statement of Undisputed Material Facts ¶ 2 ("Undisputed Facts"); Peter T92:17–94:10. The allegedly unlawful employment practice of which Peter complains is her termination, which occurred on June 25, 1999. The time between Plaintiff's termination and the filing of the EEOC charge is therefore 382 days, well over the 300 day limit allowed by statute. 42 U.S.C. § 2000e–5(e)(1).

### b. *Equitable Tolling*

■ Although Plaintiff makes no argument opposing Defendant's position that she failed timely to file her EEOC charge, the Third Circuit has warned that special caution is warranted before granting summary judgment to an employer in an employment discrimination case when intent is at issue. *Goosby*, 228 F.3d at 321; *see Abramson v. William Paterson College of New Jersey*, 260 F.3d 265 (3d Cir.2001). We therefore examine whether there exists justification in the record for tolling the 300–day limitation based on equitable principles.

■ The filing of a "timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982). Indeed, the Third Circuit has identified three scenarios in which equitable tolling is appropriate: "(1) where the defendant has actively misled the plaintiff respecting plaintiff's cause of action; (2) where the plaintiff in some extraordinary way has been prevented from asserting his or her rights; or (3) where the plaintiff has timely asserted his or her rights mistakenly in the wrong forum." *Robinson v. Dalton*, 107 F.3d 1018, 1022 (3d Cir.1997); *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1387 (3d Cir.1994); *Kocian v. Getty Refining & Marketing Co.*, 707 F.2d 748, 753 (3d Cir.1983). The doctrine of equitable tolling should be applied sparingly, however, and "restrictions on tolling . . . must be scrupulously observed". *Kocian*, 707 F.2d at 753 (quoting *School District v. Marshall*, 657 F.2d 16, 19 (3d Cir. 1981)); *also Earnhardt v. Comm. of Puerto Rico*, 691 F.2d 69, 71 (1st Cir.1982).

To survive summary judgment, a plaintiff "need only present evidence from which a jury could reasonably believe that any one of the three circumstances [in which equitable tolling is appropriate] occurred." *Calter v. Henderson*, No. CIV. A.99–5736, 2001 WL 1496450, at *5 (E.D.Pa. Nov.26, 2001); *Dougherty v. Henderson*, 155 F.Supp.2d 269, 275 (E.D.Pa.2001). Here, however, Peter has presented no evidence on the issue of equitable tolling or, for that matter, the larger issue of timeliness. Neither has Plaintiff made any argument that equitable tolling should be applied to her case, or, indeed, any argument that her ADA and PHRA claims should be heard despite their untimely filing. It does not appear from the record that she has alleged the Defendant misled her, actively or otherwise, into delaying the filing of her EEOC charge. Nor has Peter alleged any extraordinary circumstances that prevented her from asserting her right to be free from discrimination on the basis of disability. Finally, nothing in Peter's pleadings suggests that

she mistakenly asserted her rights in the wrong forum.

However, Defendant's Motion for Summary Judgment and Statement of Undisputed Facts both make reference to Plaintiff's filing of an FMLA charge with the Department of Labor on or about July 12, 1999. SJ Mot. at 1, Undisputed Facts ¶ 1. Plaintiff makes no reference to this filing in any of her motion papers, and no copy of the filing is included in the record before the court. Nevertheless, because LTI has admitted this fact, potentially adverse to its position, and because we are required to draw every inference in favor of the non-moving party, we take as fact that Peter did file an FMLA claim with the Department of Labor on or about July 12, 1999. This raises the question of whether such a filing would constitute an assertion by plaintiff of her rights in the wrong forum sufficient to demand equitable tolling of the 300–day EEOC filing requirement. In answer to this question, apparently one of first impression, we find, as discussed below, that an FMLA filing with the Department of Labor is not sufficient to require equitable tolling of the 300–day limitation period for filing an ADA charge with the EEOC.

■ Whether a previous filing will toll a present claim depends heavily on whether the claims involved assert the same cause of action. *See Johnson v. Railway Express Agency Inc.,* 421 U.S. 454, 467, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975) (holding that filing of Title VII claim does not toll the period for filing a s.1981 suit). This dependence rests on the notion that the timely filing of an EEOC charge places the employer on notice that it must protect certain evidence from loss and certain witnesses from disappearance or memory loss and prepare for claims based on occurrences sometimes long in the past. *Id.* at 467 n. 14, 95 S.Ct. 1716. Because a claim based on different substantive law may require different evidence and witnesses to be protected, "only where there is complete identity of the causes of action" would tolling be appropriate. *See id.* Quoting this language with approval, the Court found in *International Union of Electrical Workers v. Robbins & Myers, Inc.* that the Title VII filing period would not be tolled while an employee pursued a grievance or arbitration process. 429 U.S. 229, 236–40, 97 S.Ct. 441, 50 L.Ed.2d 427 (1976); *see also Delaware State College v. Ricks,* 449 U.S. 250, 261 101 S.Ct. 498, 66 L.Ed.2d 431 (1980) (pendency of a grievance or any other method of collateral review of an employment decision does not toll the EEOC filing period). Because Congress had by statute allowed for an extension, the Court found a negative implication that Congress had not intended to allow extensions of the limitations period where a claimant pursues other independent remedies. *Id.* at 240, 97 S.Ct. 441.

Indeed, the Court suggested that "assertion of an independent claim, even if related to the same factual circumstances, would not toll the running of the Title VII limitations period." *Stafford v. Muscogee Cty. Bd. of Educ.,* 688 F.2d 1383, 1388–89 (11th Cir.1982) (citing *Robbins & Myers* and holding that a Title VI claim filed with the Department of Labor did not toll a Title VII claim). This is not a situation in which a plaintiff has filed a claim asserting violations of the ADA but with an agency other than the EEOC, as was the case in *Dickerson v. United States Steel Corporation,* 439 F.Supp. 55 (E.D.Pa., 1977) (Title VII claim). Here, instead, plaintiff filed an FMLA complaint with the Department of Labor. Although the complaint itself is not before us, it presumably would have alleged that LTI unlawfully terminated Peter's employment while she was on disability leave. *See* Complaint, Counts 2 and 3. Obviously, there is not complete identity between an FMLA action and an ADA

action, given that they are based on different statutes and provide different remedies. *See Johnson*, 421 U.S. at 467 n. 14, 95 S.Ct. 1716. Even if the charge had discussed Plaintiff's disability and her need for medical leave, it would have touched on LTI's failure to accommodate her alleged disability only fortuitously. *See Robbins & Myers, Inc.*, 429 U.S. at 240 n. 14, 97 S.Ct. 441.

We therefore decline to toll the 300–day period in which Peter was required to file her ADA and PHRA charges, and grant summary judgment to the defendant as to these two claims.

### B. *Plaintiff's Failure to Submit Medical Records or Notice of Expert Medical Testimony*

■■■ Assuming *arguendo* that plaintiff's ADA and PHRA claims were not barred by virtue of untimely filing or were eligible for equitable tolling, we consider Defendant's argument that Plaintiff's failure to provide either medical testimony or to name a medical expert who will testify at trial prevents her from establishing her prima facie case under the ADA. In order to establish disability status, a plaintiff must do more than "merely submit evidence of a medical diagnosis of an impairment. Instead, [she must prove] a disability by offering evidence that the extent of the limitation in terms of [her] own experience ... is substantial." *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 122 S.Ct. 681, 691–692, 151 L.Ed.2d 615 (2002). Courts must examine evidence of the impact of an impairment on a plaintiff's ability to perform major life activities on an individualized, case-by-case basis.

*Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 566, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999).

■■■ The extent to which medical evidence is required to establish a plaintiff's prima facie case depends on the extent to which the alleged impairment is within the comprehension of a lay jury. *Marinelli v. City of Erie Penn.*, 216 F.3d 354, 360 (3d Cir.2000). Thus, medical evidence would not be necessary to establish a disability as obvious as a missing arm, *see id.* (citing *Katz v. City Metal Co.*, 87 F.3d 26, 32 (1st Cir.1996)), or arm and neck pain resulting from an injury caused by a truck accident, *id.*, but would be necessary to establish that deep vein thrombosis (which may cause a thinning of the blood) substantially interferes with a plaintiff's major life activities sufficiently to constitute a disability. *Lakota v. Sonoco Products Company*, No. CIV.A.00–30219–FHF, 2002 WL 596211 (D.Mass. Apr.4, 2002).

If the only evidence contained in the record was Dr. Galgon's diagnosis of sleep apnea, we might well agree with Defendant. However, Dr. Galgon's diagnosis provides slightly more insight into the effect of Peter's illness on her functioning, in that his handwritten notes indicate that Plaintiff was "disabled because of severe sleepiness and sleep apnea." SJ Mot. Ex. K. In addition, Peter has testified as to the extent of the limitation on her performance of major life activities and LTI, through its employee Jennie Hunsicker, has offered further evidence of the extent of plaintiff's limitations sufficiently for a lay jury to decide that they are severe enough for their cause, sleep apnea, to constitute a disability.[3]

---

**3.** This case is therefore distinguishable from the two district court opinions offered by Defendant in its brief, in which the respective plaintiffs failed to provide either medical evidence as to the effect of their condition on major life activities or personal, individualized evidence of such effect. *See Dorn v.*

*Potter*, 191 F.Supp.2d 612, 624 (W.D.Pa.2002) (noting that plaintiff's only evidence consisted of doctor's reports which indicated plaintiff was possibly untruthful during a physical exam and of plaintiff's spouse's conclusory statements that plaintiff was substantially re-

Peter testified that she would fall asleep "several times a day" for a period of "maybe a few minutes" each time. Peter T26:15–27:7. She testified, further, that she would "get sleepy" while driving her car and that the problem was bad enough that she would fall asleep while working at her supervisor's desk. Peter T25:20–23, 27:16–20. Plaintiff's condition caused her to seek treatment in the form of a CPAT machine, surgery on her adenoids and tonsils, and pure oxygen therapy. Peter T31:24–34:21. Jennie Hunsicker observed Peter falling asleep at work and had been told by Peter that she once dozed off while driving her car to work. Hunsicker T9:15–20. Hunsicker further testified that she believed these issues symptomatic of an "illness" which caused her to suggest to Peter that she "needed to make a decision since her illness was now hampering her productivity and work performance even more". Hunsicker T9:1–3. Taken together, these facts flesh out the impact that the spare medical diagnosis of sleep apnea had on Peter's major life activities. While it may be true that " 'sleep apnea' is not an impairment that is so obvious that it renders medical testimony unnecessary," Reply at 6, the effect of Plaintiff's sleep apnea, i.e. severe sleepiness, is "among those ailments that are the least technical in nature and most amenable to comprehension by a lay jury." *Marinelli*, 216 F.3d at 361. We therefore reject Defendant's argument that Plaintiff cannot establish her prima facie case under the ADA absent medical evidence in the record and now move to considering whether Plaintiff has, in fact, established her prima facie case.

## C. *Plaintiff's Prima Facie Case Under the Americans with Disabilities Act*

 To establish a prima facie case of employment discrimination under the ADA, "a plaintiff must be able to establish that he or she (1) has a 'disability,' (2) is a 'qualified individual,' and (3) has suffered an adverse employment action because of that disability". *Deane v. Pocono Med. Ctr.*, 142 F.3d 138, 142 (3d Cir.1998) (en banc) (citations omitted). In this case, all three elements are disputed. Before turning to the first element, whether Peter has a disability, we note that we will discuss only Peter's ADA claim because our analysis of an ADA claim applies equally to a PHRA claim. *Kelly v. Drexel University*, 94 F.3d 102, 105 (3d Cir.1996).[4]

### 1. *Plaintiff's Alleged Disability*

A plaintiff can establish that she has a disability if she has a mental or physical impairment that substantially limits a major life activity, has a record of such an impairment, or is regarded has having such an impairment. 42 U.S.C § 12102(2). Here, Peter was diagnosed as having sleep apnea by Dr. Galgon. SJ Mot. Ex. K. Defendant disputes that sleep apnea is a disability per se and further argues that Peter's sleep apnea does not substantially limit her in the major life activities of talking and interacting with others, working, and sleeping. SJ Mot. 12–19. Al-

stricted in performing major life activities); *Lanni v. City of Philadelphia*, No. CIV.A.01–4726, 2002 WL 1160758 (E.D.Pa. May 30, 2002), 2002 U.S. Dist. LEXIS 9664 (finding that plaintiff's submission of doctor's bills, lacking any medical information, and dictionary definitions of her ailments was insufficient to provide individualized evidence of the impact of those ailments on her major life activities.) We note that although Dr. Galgon's notes are before us at this point, Plain-

tiff would have to establish some means of getting them received into evidence at trial.

4. We further note that we have already dismissed Peter's ADA and PHRA claims on the basis of her failure to file her EEOC charge within the statutory period. *See supra* Part V.A. We briefly consider the merits of her claim assuming, *arguendo*, that she had timely filed her charge or is entitled to equitable tolling of the period.

though not made explicit in Plaintiff's memorandum, she appears to argue that a record of diagnosis for sleep apnea alone would be sufficient for a finding of disability and, furthermore, that she is substantially limited in the major life activity of sleeping. Opp. to SJ at 7–9. Peter does not provide any argument opposing Defendant's position as to the major life activities of talking and interacting with others and of working, though her complaint does make those allegations. Complaint ¶ 16. Peter's failure to respond to LTI's arguments on these points is not fatal to her claim, however, because "even where the non-movant has not opposed a motion for summary judgment, this court has an obligation to independently determine whether the movant has a right to judgment as a matter of law." *Lehigh Valley Health Network v. Executive Risk Indemnity,* No.1999–cv–5916, 2001 WL 21505 (E.D.Pa. Jan5, 2001), 2001 U.S. Dist. LEXIS 73; *See* U.S. Dist. Ct. E.D.Pa. L.R. Civ. P. 7.1(c).

a. *Sleep Apnea as a Per Se Disability*

 LTI urges that "the majority of courts" to have considered the issue have held that sleep apnea does not constitute a disability within the meaning of the ADA. SJ Mot. at 14. However, an examination of LTI's citations to these decisions reveals that none of them are from courts within this circuit; they are therefore of limited value in answering this question. *See Id.* (citing *Hill v. Metropolitan Atlanta Rapid Transit Auth.,* 77 F.Supp.2d 1291 (N.D.Ga.1999); *Taylor v. Blue Cross and Blue Shield of Texas,* 55 F.Supp.2d 604, 611 (N.D.Tex.1999); *Mont–Ros v. City of West Miami,* 111 F.Supp.2d 1338 (S.D.Fla. 2000); *Williams v. City of Charlotte,* 899 F.Supp. 1484 (W.D.N.C.1995)). In fact, no court in this circuit appears to have decided whether sleep apnea is, on its own, enough to qualify as a disability, probably because "a particular diagnosis, no matter how severe, . . ., standing alone, is not sufficient to establish 'disability' ". *Tice v. Centre Area Transp. Auth.,* 247 F.3d 506, 513 n. 5 (3d Cir.2001). Indeed, the ADA requires an individualized, case-by-case approach to evaluating whether a plaintiff's impairment is severe enough to constitute a disability. *Albertson's, Inc., supra,* 527 U.S. at 566, 119 S.Ct. 2162. Thus, while we agree with Defendant that sleep apnea is not, per se, a disability, we reject the converse position, that sleep apnea is, per se, *not* a disability, and inquire, instead, into whether this plaintiff's sleep apnea substantially limits her major life activities.

b. *Plaintiff's Limitations With Respect To Major Life Activities.*

Defendant does not dispute the notion that sleep apnea is a physical impairment within the meaning of the ADA. However, LTI does argue that Peter's sleep apnea does not substantially limit her ability to perform the major life activities of talking and interacting with others, sleeping, and working. SJ Mot. at 14–18. Plaintiff argues in brief only that she is substantially limited in the major life activity of sleeping, Opp. to SJ at 7–9, and makes no response to Defendant's position as to the other two major life activities cited in her original complaint. Although this omission does not doom Peter's claim that she is substantially limited with regard to these two activities, we consider its merits only briefly. *See Apple Corps,* 1998 WL 126935, , 1998 U.S. Dist. LEXIS 3366.

 The Third Circuit follows the two-step analysis recommended by the EEOC's interpretive guidelines for determining whether a plaintiff is substantially limited in her ability to perform a major life activity. *See Mondzelewski v. Pathmark Stores, Inc.,* 162 F.3d 778, 783 (citing 29 C.F.R. Pt. 1630, App. § 1630.2(j));

*Reese v. American Food Service,* No. CIV. A.99–1741, 2000 WL 1470212, at *5 (E.D.Pa. Sept.29, 2000). A court must first determine whether the plaintiff is significantly limited in a life activity other than working. *Mondzelewski,* 162 F.3d at 783. Only if the court finds that this is not the case should it move to considering whether plaintiff is substantially limited in the major life activity of working. *Id.*

■ An individual is substantially limited when she is "[u]nable to perform a major life activity that the average person in the general population can perform" or "[s]ignificantly restricted as to the condition, manner, or duration under which [she] can perform a particular major life activity, as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1). Major life activities include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(i). If an activity is not enumerated among the EEOC's exemplars of major life activities, the court must evaluate its significance to determine whether it is a major life activity within the meaning of the ADA. *Bragdon v. Abbott,* 524 U.S. 624, 638, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998).

#### i. *Major Life Activities*

Plaintiff claims that she is limited in the major life activities of talking and interacting with others, sleeping, and working. Complaint at ¶ 16. Of these, only working has been expressly recognized as a major life activity in this circuit.[5]

■ Talking and interacting with others is not universally recognized as a major life activity. *Compare Soileau v. Guilford of Maine, Inc.,* 105 F.3d 12, 15 (1st Cir.1997) *with McAlindin v. County of San Diego,* 192 F.3d 1226, 1234–35 (9th Cir.1999). Although talking and interacting with others has not expressly been determined by this Circuit to be a major life activity, this Circuit, consistent with EEOC guidelines, is generally unwilling to take a narrow view of what constitutes a major life activity. *See Taylor v. Phoenixville Sch. Dist.,* 184 F.3d, 296, 306–310 (3d Cir.1999); *Deane,* 142 F.3d at 143 n. 4. Communication and sociability problems cover a broad spectrum of severity, and we feel that it is a better approach to sort out minor socialization difficulties by using the substantial impairment test rather than to decide that talking and interacting with others is not a major life activity.

Sleeping has been recognized by many courts and the EEOC guidelines as a major life activity. *See Pack v. Kmart Corp.,* 166 F.3d 1300, 1305 (10th Cir.1999); *McAlindin,* 192 F.3d at 1234; *Bennett v. Unisys Corporation,* No. 2:99CV0446, 2000 WL 33126583, at *5 (E.D.Pa. Dec.11, 2000); *Reese,* 2000 WL 1470212, at * 6; *Tedeschi v. Sysco Foods of Philadelphia,* No. CIV. A.99–3170, 2000 WL 1281266, at *5 (E.D.Pa. Sept.5, 2000); Enforcement Guidance on the Americans with Disabilities Act and Psychiatric Disabilities, Compliance Manual, COMPLIANCE MANUAL (CCH) P6906, at 5398 (1998) ("EEOC Compliance Manual"). As with socialization problems, sleep disorders vary widely in severity. Thus, although one court in this district has held that the ability to get a sound night's sleep and report to work

---

**5.** The Supreme Court has questioned whether working is a major life activity, but has not resolved the issue. *Sutton v. United Air Lines,* 527 U.S. 471, 492, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999); *also Toyota Motor Mfg.,* 534 U.S. at 189–190, 122 S.Ct. 681 (declining to extend the analysis in *Sutton* ). Working is presently recognized as major life activity in the Third Circuit. *Mondzelewski,* 162 F.3d at 783.

on time and clear-minded was not a major life activity, *Sarko v. Penn–Del Directory Co.*, 968 F.Supp. 1026, 1034 n. 8 (E.D.Pa. 1997), we will examine Peter's difficulties sleeping in the substantial impairment analysis rather than hold that sleeping is not a major life activity.

### ii. *Substantial Limitation*

### a. *Talking and Interacting With Others*

 The activity of interacting with others is substantially limited only where an individual's socialization is "characterized on a regular basis by severe problems such as high levels of hostility, social withdrawal, or failure to communicate when necessary." *Olson v. Dubuque Cmty. Sch. Dist.*, 137 F.3d 609, 612 (8th Cir.1998) *quoting* EEOC Enforcement Guidance: Psychiatric Disabilities and the Americans with Disabilities Act § 9 (March 25, 1997), EEOC Compliance Manual (BNA). This requires a showing of more than mere difficulty in getting along with coworkers, irritability or temperamentality. *McAlindin*, 192 F.3d at 1235, *Duda v. Bd. of Educ.*, 133 F.3d 1054, 1059 (7th Cir.1998). A plaintiff need not, however, demonstrate a complete inability to communicate and interact with others. *Bennett*, 2000 WL 33126583, at *5.

Other than the allegation contained in her complaint, Peter has made no reference to difficulty in communicating or interacting with others. The closest she approaches to offering evidence on this point is when she testifies in her deposition that she would fall asleep in the middle of transferring an incoming phone call to the appropriate party. Peter T120:1–121:8.[6] Plaintiff reports no other difficulty in the

actual act of communicating, i.e. speaking, nor does she offer any testimony as to conflict or hostility with her co-workers. Plaintiff herself viewed her problem of falling asleep in mid-transfer as a work-related "mistake" that could not be corrected, and not as a general problem in communication or interaction. *See* Peter T119:17–25. Even taking Peter's testimony in the light most favorable to her, the most that can be said of the paltry evidence in the record is that Plaintiff was too sleepy to transfer phone calls properly. This does not rise to the level of a substantial limitation on a major life activity, and we view difficulty in transferring phone calls, to the extent it can be regarded as a limitation on the ability to communicate, as more akin to "mere trouble getting along with co-workers" in the interaction context, *McAlindin*, 192 F.3d at 1235, than to "high levels of hostility, social withdrawal, or failure to communicate when necessary," *Olson*, 137 F.3d at 609.

### b. *Sleeping*

 In order to demonstrate a substantial limitation on the major life activity of sleeping, a plaintiff must show that she is significantly restricted in the condition, manner or duration of sleep as compared to the average person in the general population. 29 C.F.R. § 1630.2(j)(1)(i) and (ii); *Pack*, 166 F.3d at 1305. Because sleep problems are very common in the average population, a plaintiff must experience more than the occasional sleepless night or tired day to be considered substantially limited in her ability to sleep. *Bennett*, 2000 WL 33126583, at * 6 (citing a Washington Post survey indicating 71% of American adults average five to eight

---

**6.** Although Peter offered this testimony in answer to a question as to her limitations at work, her brief points to it as evidence of a limitation on "her ability to communicate with people, and perform her job duties".

Opp. to SJ at 9. In deference to Plaintiff as the non-moving party, we will accordingly treat this testimony as evidence of limitation on her ability to communicate and interact with others.

hours of sleep a night on weeknights); *Pack,* 166 F.3d at 1306. The EEOC's Guidance on Psychiatric Disabilities indicates that a person is not substantially limited in her ability to sleep merely because she has trouble falling asleep, occasionally does not sleep soundly or is only mildly limited by poor sleep. EEOC Compliance Manual at P6906, p. 5398, Q3 and P125,686. The key factors in determining whether an impairment causes substantial limitation are "(1) the nature and severity of the impairment; (2) the duration or expected duration; and (3) the expected or actual permanent or long-term impact of or resulting from the impairment". *Taylor v. Pathmark Stores, Inc.,* 177 F.3d 180, 185 (3d. Cir.1999).

Examining each of these factors in turn, we find that Peter has offered enough evidence to create a triable issue of fact with regard to whether she is substantially impaired in her ability sleep. Peter was diagnosed with "severe sleep apnea." SJ Mot. Ex. K. She has testified that, at the time she worked for LTI, she was awakened "five to six times a night," which would occasionally result in her getting out of bed. Peter T35:14–18. Her inability to sleep properly impacted her life to the extent that she would fall asleep several times each day for a few minutes, *Id.* at 26:14–25, fall asleep while transferring phone calls, *Id.* at 120:1–121:8, and become sleepy while driving to work, *Id.* at 25:20–23. As to the expected duration and permanence of her sleep apnea, Peter has testified that therapy with a CPAT machine, surgery on her tonsils and adenoids, and pure-oxygen therapy have all been unsuccessful, *Id.* at T31:24–34:21, and that she continues to fall asleep on her feet at her current job. *Id.* at 37:1–11.

Defendant contends that other courts have determined more severe sleep apnea not to be a disability. *See* SJ Mot. at 17–18 *citing Kolecyck–Yap v. MCI Worldcom,* *Inc.,* No. 99CV8414, 2001 WL 245531, at *10 (N.D.Ill. Mar.12, 2001) (plaintiff underwent two surgeries to correct condition) and *Bond v. Sheahan,* 152 F.Supp.2d 1055, 1066 (N.D.Ill.2001) (plaintiff awakened during the night, short of breath, with worsening symptoms during the day). A jury may well agree with LTI and find that Peter's sleep problems and their impact were no worse than those experienced by the average member of the general population. However, this is a factual issue and Peter has produced sufficient evidence to preclude summary judgment on this point. *See Bennett,* 2000 WL 33126583, at *7. Nevertheless, because Peter has failed to demonstrate that she requested reasonable accommodation, *see infra* Part V.C.2.b, part of her prima facie case, even had she timely filed her ADA charge with the EEOC we would be compelled to grant summary judgment to LTI.

### c. *Working*

▮ Although we have found that Peter has produced enough evidence to demonstrate a disability on the basis that her sleep apnea substantially limits her ability to perform the major life activity of sleeping, and we need not, therefore, consider whether she is also substantially limited with regard to the major life activity of working, *see Mondzelewski,* 162 F.3d at 783, we nonetheless briefly examine this claim as well.

▮ To be substantially limited in the major life activity of working, "one must be precluded from more than one type of job, a specialized job or a particular job of choice." *Sutton,* 527 U.S. at 492, 119 S.Ct. 2139. EEOC regulations specify that the inability to perform a single, particular job does not constitute a substantial limitation on working. 29 C.F.R. § 1630.2(j)(3)(i). Furthermore, in an ADA case, the plaintiff bears the burden of es-

tablishing that due to her impairment, she is limited in her ability to perform either a class of jobs or a broad range of jobs in various classes "as compared to the average person having comparable training, skills and abilities." *Mondzelewski,* 162 F.3d at 784. Thus, a court must consider an individual's training, skills and abilities in order to evaluate whether their particular ailment constitutes, for that particular person, a significant limitation on employment. *Id.* The plaintiff's reliance on cases in which a particular court has found that "sleep apnea is a condition that precludes an individual from more than one type of job", Opp. to SJ at 8, is therefore unavailing—"it is the impaired individual that must be examined, and not just the impairment in the abstract." *E.E. Black, Ltd. v. Marshall,* 497 F.Supp. 1088, 1099 (D.Haw. 1980).

In the present case, Plaintiff has produced no evidence to suggest that she is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs." *Walton v. Mental Health Ass'n. of Southeastern Pennsylvania,* 168 F.3d 661, 665 (3d Cir.1999). After leaving LTI, Peter obtained work as a supermarket cashier, first for Weiss Market and then for Wal–Mart, where she is presently employed. She has never been reprimanded at either job for any work-related effects of her alleged disability and has neither requested nor received any accommodation for it. Peter T36:20–25, 37:12–14, 39:9–20, 40:4–6. Furthermore, before working at LTI, Peter was employed as a certified nurse's aide. She has not indicated that she was ever limited in her ability to perform that job because of her alleged disability, and, indeed, testified that she left that position because she was "burned out". Peter T18:23–19:3, 19:14–17. Nor has she offered evidence that it was her disability that caused her to look for work outside the field of secretarial employment. Instead, she testified that she wanted a change in career. Peter T12:23–13:6.

The only evidence Plaintiff does provide indicates that, at most, she was limited in her ability to do the particular job that she held at LTI, which is insufficient to establish a substantial limitation on the major life activity of working. *See Walton,* 168 F.3d at 665 (citing 29 C.F.R. 1630.2(j)(3)(i)). Peter testified that she fell asleep at work several times each day for a few minutes at a time, would fall asleep while transferring phone calls and made errors in paperwork. Peter T26:14–25, 67:14–20, 120:1–121:8. Even if these difficulties constituted a "significant restriction" on Peter's ability to perform her duties in her particular job at LTI, she has offered no evidence to demonstrate that she faced similar "significant restrictions" in any other job or type of job. Thus, we find that Peter was not substantially limited in her ability to perform the major life activity of working.

### 2. *Plaintiff was a Qualified Individual*

 We now proceed to the second element of Plaintiff's prima facie case. As in the foregoing section, we assume for the present that Plaintiff had timely filed her EEOC charge and/or would be entitled to equitable tolling and ask whether, having established that she has a disability (in that she is substantially limited in her ability to perform the major life activity of sleeping, *see supra* Part V.C.1.b.ii.*b* ), she was a qualified individual within the meaning of the ADA.

 The ADA defines a qualified individual as one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8) (2002). In evaluating whether Plaintiff is a qualified individual, we must decide whether (1) she "satisfies

the requisite skill, experience, education and other job-related requirements of the position" and (2) she, "with or without reasonable accommodation, can perform the essential functions of the position." *Deane,* 142 F.3d at 145. LTI disputes both points.

### a. *Skill, Experience and Education*

Defendant argues that Plaintiff lacked the requisite skill, experience and education necessary for her position on the basis of several negative disciplinary actions taken by LTI against Peter for her poor performance. We are, however, unpersuaded by Defendant's claims on this point. First, LTI hired Peter in October of 1994. Peter T17:9–11. We infer, favorably to Peter as the non-moving party, from the fact that LTI hired Peter for this position that it determined that she had the requisite experience and education to perform her duties.

LTI's argument appears focused, then, on whether Peter actually had the requisite skill to perform her job. LTI contends that three employment events indicate Peter's lack of skill: the November 21, 1996 and November 4, 1997 performance memoranda and the January 13, 1999 probation memorandum. SJ Mot. at 19–21. LTI also points to testimony from Hunsicker that she spoke to Peter on several occasions about the poor quality of her work. *Id.* There are three problems with this evidence. First, it establishes at best only that Peter was having difficulty performing her job. It does not necessarily speak to her skill, but may, instead, speak to the issue of whether she could perform the essential functions of her position without accommodation. Second, Hunsicker testified that Peter had never, to her knowledge, received less than a competent appraisal in her annual evaluations. Hunsicker T21:18–20. Kuntz corroborated Hunsicker's testimony, describing with specificity the Plaintiff's numerical scores.

Kuntz T7:1–19:12. Peter has produced enough evidence on this issue that there is a genuine question as to whether her performance was uniformly negative, or whether she was competent over all with periodic negative deviations. Third, LTI's position on this issue is inconsistent with its repeated claim that the only reason Peter was terminated was that she had neither reported to work nor provided medical certification for a period of one month. Hunsicker T21:21–22:1; Kuntz T48:10–17. Indeed, although Plaintiff was placed on a one-month probation in January of 1999, she was not actually terminated until June of 1999. Taken together, these facts create, at the very least, a genuine dispute as to the material question of whether Peter had the requisite skill to perform her job.

### b. *Accommodation*

Defendant does not dispute that Plaintiff could not perform her job without accommodation. SJ Mot. at 21. We therefore will consider only whether Peter was entitled to accommodation.

An employer commits unlawful discrimination under the ADA when it does "not mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the business [of the employer]." 42 U.S.C. § 12112(b)(5)(A) (2002). The ADA requires that employers and employees engage in an interactive process to identify the employee's limitations resulting from a disability and the kinds of accommodation which would be both appropriate and feasible. 29 C.F.R. § 1630.2(o)(3). The Third Circuit has placed the responsibility on both parties to engage in the interactive process in good faith, and indicated that our duty is to isolate the cause of any breakdown and

assign responsibility for it. *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 312 (3d Cir.1999).

 The employee bears the responsibility of initiating the interactive process by providing notice of her disability and requesting accommodation for it. *Id.* at 313. The employee's request need not be written, nor need it include the "magic words 'reasonable accommodation,' [but] the notice must nonetheless make clear that the employee wants assistance for his or her disability." *Id.* Once the employer knows of the disability and the desire for the accommodation, it has the burden of requesting any additional information that it needs, and to engage in the interactive process of designing a reasonable accommodation—the employer may not "in the face of a request for accommodation, simply sit back passively, offer nothing, and then, in post-termination litigation, try to knock down every specific accommodation as too burdensome." *Id.* at 316.

In this case, Defendant argues that it was not aware of Plaintiff's disability and that Plaintiff's request for indefinite leave, assuming it constituted a request for an accommodation, was not reasonable. Although LTI denies that it knew Peter had a condition known as sleep apnea, it cannot deny that it knew Plaintiff was having difficulty on the job caused by her inability to sleep. In this regard, Jennie Hunsicker's testimony that she told Peter her "illness" was getting to the point where she should consider going on disability leave is particularly damning. Hunsicker T8:19–10:2.

However, we agree with Defendant that it was not required to provide an indefinite leave as an accommodation because Peter never initiated the interactive process. Although a disabled employee need not make a request for an accommodation in writing or use the "magic words," she still must place her employer on notice that she has a disability and desires accommodation. In this case, after her conversation with Hunsicker, Peter went on what she termed "disability leave." However, she did not indicate when she thought she would be back, nor did she provide her employer with medical documentation to demonstrate her need for disability leave. She had no further contact with LTI except to tell them that her paperwork was still at her doctor's office. Employers are not required to "assume employees are disabled and need accommodations." *Taylor*, 184 F.3d at 313. As in *Jones v. United Parcel Service*, 214 F.3d 402, 408 (3d Cir. 2000), here Plaintiff's only request to her employer was that it pay her disability benefits; she did not request leave for a specified period of time (or provide medical documentation to support such a request), altered job duties or hours, or a different position. We are persuaded that LTI did not have an obligation to engage in the interactive process of determining an appropriate and feasible accommodation because Peter never initiated the process by requesting accommodation.[7]

7. Peter argues, in essence, that Dr. Galgon's medical certification should have been sufficient to initiate the process with LTI even though it arrived after Peter was terminated. Opp. to SJ at 15–16 (citing *Cehrs v. Northeast Ohio Alzheimer's Research Center*, 155 F.3d 775, 784 (6th Cir.1998) for the proposition that an employer must provide additional medical leave even when the request is received subsequent to termination). We can find no support for this proposition in the case law of this Circuit. While it does have some appeal, we decline to adopt Plaintiff's position for two reasons. First, *Cehrs* and the cases cited therein all involved situations in which the employee diligently remained in contact with the employer and where it was understood that the initial medical leave was for the purpose of resolving a documented medical disability. Here, Peter initiated no contact with her employer and did not docu-

Thus even had Plaintiff submitted her charge to the EEOC in a timely manner, she could not make out her prima facie case because she was not a qualified individual within the meaning of the ADA. We therefore need not consider the third element of the prima facie case, whether Peter suffered an adverse employment action on the basis of her disability.

### D. Plaintiff's FMLA Interference Claim

Courts have recognized that the FMLA creates two essentially distinct causes of action. *See, e.g., Bachelder v. America West Airlines, Inc.,* 259 F.3d 1112 (9th Cir.2001); *Strickland v. Water Works and Sewer Board of the City of Birmingham,* 239 F.3d 1199 (11th Cir.2001). First, it is unlawful under the FMLA for an employer "to interfere with, restrain, or deny the exercise of or the attempt to exercise" any right secured by the Act. 29 U.S.C. § 2615(a)(1) (2002). Claims pursued under this provision are frequently referred to as "interference" claims. *Marrero v. Camden Cty. Bd. of Social Services,* 164 F.Supp.2d 455, 463 (D.N.J.2001). Second, the FMLA makes it unlawful for an employer to "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [29 U.S.C. § 2615]." 29 U.S.C.

§ 2615(a)(2) (2002). Such claims are usually termed "discrimination" claims. *See Marrero,* 164 F.Supp.2d at 463. In this case, Plaintiff claims that she was improperly terminated in order to interfere with the exercise of her rights created by the FMLA. The meat of her complaint is that because she was entitled to FMLA leave in June of 1999, the month-long absence for which she was fired could not legally be considered grounds for dismissal.

As applicable here, the FMLA provides that "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12–month period ... because of a serious health condition that makes the employee unable to perform the functions of [her] [position]." 29 U.S.C. § 2612(a)(1)(D) (2002). Following a qualified leave, an employee is entitled to return to the same or an alternate position with equivalent pay and benefits. 29 U.S.C. § 2614(a)(1) (2002); 29 C.F.R. § 825.100(c).

When an employee seeks leave to care for a loved one or because they have a serious health condition that precludes them from working, her employer may require the employee to submit a certification completed by a health care provider. 29 U.S.C. § 2613(a) (2002). If the em-

---

ment her condition prior to taking leave. Hunsicker T10:2–4. Without medical documentation, Hunsicker could not even determine whether the requested leave was legitimately for disability reasons. *Id.* at 9:23–25, 10:1. Second, even if Dr. Galgon's medical note indicating Peter would not be able to work "indefinitely" could be construed as a request for accommodation, many courts have found that a request for indefinite leave is inherently unreasonable, particularly where there is no favorable prognosis. *Shannon v. City of Philadelphia,* No. CIV.A.98–5277, 1999 WL 1065210 (E.D.Pa. Nov. 23, 1999); *Myers v. Hose,* 50 F.3d 278, 283 (4th Cir.1995) (stating that reasonable accommodation does not require employer to wait indefinite period); *Rogers v. International Marine Terminals, Inc.,*

87 F.3d 755, 759–60 (5th Cir.1996) (same); *Hudson v. MCI Telecommunications Corp.,* 87 F.3d 1167, 1169 (10th Cir.1996) (stating that indefinite leave with no indication of favorable prognosis was not reasonable accommodation); *Monette v. Electronic Data Sys. Corp.,* 90 F.3d 1173, 1188 (6th Cir.1996) (observing that employer had no way of knowing when, or even if, employee would return to work). Although LTI would still have been under a duty to engage in an interactive process to determine whether some less burdensome accommodation would have sufficed, *see Taylor,* 184 F.3d at 312, given the timing and doubtful nature of the communication, we find that Peter did not make a sufficient request for accommodation.

ployer exercises this right, it (1) must provide written notice to the employee that it requires such certification and (2) must advise the employee of the consequences of a failure to provide certification. 29 C.F.R. § 825.305. Moreover, the employer must provide the employee with at least 15 calendar days to submit the medical certification. 29 C.F.R. § 825.305. Failure to provide such notice and opportunity constitutes "interfering with, restraining, or denying the exercise of rights provided by the Act." 29 C.F.R. § 825.200.

Once apprised of the need for medical certification, the employee "must provide the requested certification to the employer within the time frame requested by the employer (which must allow at least 15 calendar days after the employer's request), unless it is not practicable under the particular circumstances to do so despite the employee's diligent, good faith efforts." 29 C.F.R. § 825.305(b).

Defendant argues that Peter was not eligible for FMLA leave because she did not have a serious health condition and that, even if she did, she did not comply with the requirements of the FMLA by failing timely to submit medical certification of her condition at LTI's request. Peter contends that she does have a serious health condition that precluded her from working and that her failure to provide the requested medical documentation was despite her diligent, good faith efforts and therefore not fatal to her claim. We discuss each of these arguments in turn below as well as an additional issue which neither party has raised but nonetheless militates against granting summary judgment, whether LTI's notice to Peter of the FMLA's requirements was sufficient. *See Lehigh Valley Health Network*, 2001 WL 21505, 2001 U.S. Dist. LEXIS 73; U.S. Dist. Ct. E.D.Pa. L.R. Civ. P. 7.1(c).

### 1. *Did Peter Have a Serious Health Condition?*

The FMLA defines a serious health condition as "an illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611 (2002). The implementing regulations provide further guidance as to what "continuing treatment by a health care provider" means:

(i) A period of incapacity (i.e., inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom) of more than three consecutive calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:

(A) Treatment two or more times by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or

(B) Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider....

(iii) Any period of incapacity or treatment for such incapacity due to a chronic serious health condition. A chronic serious health condition is one which:

(A) Requires periodic visits for treatment by a health care provider, or by a nurse or physician's assistant under direct supervision of a health care provider;

(B) Continues over an extended period of time (including recurring epi-

sodes of a single underlying condition); and

(C) May cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.). . . .

29 C.F.R. 825.114(a)

Treatment in this sense includes examinations for the purposes of diagnosis. 29 C.F.R. § 825.114(b).

Defendant's arguments on this issue conflate what is required to prove that an individual is disabled within the meaning of the ADA with what is required to prove that an individual has as serious medical condition within the meaning of the FMLA. LTI argues that because Peter never saw a doctor to request certification for disability leave prior to Hunsicker's suggestion and because she has since been able to work without accommodation, she does not have a serious medical condition. SJ Mot. at 29. However, even if it were true that Peter "has not been incapacitated in her ability to work or perform other daily activities due to her impairment" since leaving LTI, Peter has produced enough evidence that a jury could reasonably find that she had a serious medical condition when she worked for LTI that precluded her from performing the functions of her position. Indeed, she has produced evidence tending to show her serious medical condition on the basis of either of the two relevant definitions of "continuing treatment by a health care professional."

Peter stopped working at LTI's suggestion for the purpose of seeing a medical professional about her "illness" on May 28, 1999. This began her "period of incapacity" within the meaning of the FMLA regulations, given that her physician certified her on June 25, 1999 as unable to work beginning on June 1, 1999 (SJ Mot. Ex. K), and this period extended well beyond the three calendar days required therein. Peter visited Dr. Galgon twice for the purpose of testing and diagnosis (i.e., "treatment") and, after her termination, was referred to Dr. Pestcoe, an Ear, Nose and Throat specialist, whom she continued to see and receive treatment from on a regular basis until December of 1999, when he removed her adenoids and tonsils. Peter T33:15–34:4. She thus experienced a period of incapacity for a period of more than three calendar days and received subsequent treatment for her condition that resulted in both two or more visits to a health care provider and a regimen of continuing treatment under the supervision of a health care provider. See 29 C.F.R. § 825.114(a)(2)(i).

Peter's one-month absence from work, under the orders of Dr. Galgon, also qualifies as "any period of incapacity . . . due to a chronic serious health condition." 29 C.F.R. § 825.114(a)(iii). Peter's sleep apnea required periodic visits to Dr. Pestcoe for treatment with a CPAT machine, straight oxygen and surgery. Peter T31:20–34:5. see 29 C.F.R. § 825.114(a)(iii)(A) In addition, her condition continued over an extended period of time. Peter T35:3–6 (her sleep apnea remains "a daily problem"); see 29 C.F.R. § 825.114(a)(iii)(B). Finally, her sleep apnea manifests in episodic, rather than continuous, fashion in that she falls asleep episodically during the day. See 29 C.F.R. § 825.114(a)(iii)(C).

We therefore find that Plaintiff has produced sufficient evidence for a jury reasonably to find that she had a serious health condition that qualified her for FMLA leave.

### 2. Did Peter Satisfy her Obligations as an Employee Under the FMLA?

 Defendant contends that, first, Peter never put LTI on notice that her request for leave would qualify as FMLA leave, and, second, that because Peter did

not submit medical certification within a reasonable time, she was not entitled to FMLA leave. The first argument is completely without merit. Peter began her leave at the request of Hunsicker, one of LTI's administrators, who told her that she should see a doctor about her "illness" to determine whether she would qualify for FMLA leave. Hunsicker T8:24–10:1. Although Hunsicker denies that she knew Peter would be seeing a doctor, she herself suggested that Peter should do so, and she knew within a week that Peter had seen a doctor. *Id.* at T10:1–5. Moreover, Peter contends that she did tell Hunsicker that she was seeing a doctor at the time she took her leave. Peter T44:3–9. The fact that Hunsicker may not have known Peter's specific diagnosis (a disputed point) is irrelevant in any case because the regulations are clear that once the employer determines that it requires more information to determine whether FMLA leave is being requested, the burden shifts to the employer to investigate further. *Wilson v. Lemington Home for the Aged,* 159 F.Supp.2d 186, 192 (W.D.Pa.2001). Indeed, LTI's request for medical certification pursuant to the FMLA is strong evidence that LTI knew Peter's request was potentially FMLA-eligible.

As to LTI's second argument, it is true that if an employee never submits medical certification that has been requested by her employer, her leave is not FMLA leave. 29 C.F.R. § 825.312. However, this is not a case in which an employee did not submit any medical certification. Rather, Peter submitted her medical certification after some delay, during which LTI phoned her several times to determine the status of the paperwork. The question we must answer is whether Peter's delay in submitting the requested medical certification is fatal to her claim that LTI terminated her in violation of the FMLA. We find that Peter has produced sufficient evidence that a reasonable jury could find her delay excusable, and decline to grant summary judgment on this issue.

The FMLA contains a built-in equitable provision in its regulations, specifying that an employee must submit requested medical certification "within the time frame requested by the employer (which must allow at least 15 calendar days after the employer's request), *unless it is not practicable under the particular circumstances to do so despite the employee's diligent, good faith efforts.*" 29 C.F.R. § 825.305(b) (emphasis supplied).[8] *See also Rager v. Dade Behring, Inc.,* 210 F.3d 776, 779 (7th Cir.2000) (finding that the time given to an employee in which to provide requested medical certification is subject to equitable tolling).

 In general, what is practicable in terms of timing is based on the facts and circumstances of each case and is a question for the jury. *Hopson v. Quitman County Hosp. and Nursing Home, Inc.,* 126 F.3d 635, 640 (5th Cir.1997); *Manuel v. Westlake Polymers Corp.,* 66 F.3d 758, 764 (5th Cir.1995). Good faith requires "at least that the employee contact his employer by telephone and make it aware that he is unable to return his certification before the deadline." *Washington v. Fort James Operating Co.,* No. CIV.99–1300–JO, 2000 WL 1673134, at *5, (D.Or. Nov.7, 2000). Here, Plaintiff informed her em-

**8.** LTI cites this portion of the regulations for the proposition that an employee "must provide the requested medical certification within the time frame requested by the employer or at least 15 calendar days after the employer's request." SJ Mot. at 30. This is a disingenuous rendition of the rule which, as quot-

ed, indicates that the *employer* must *provide* at least 15 days in which to respond, and *not* that the *employee* must *respond* within 15 days. In addition, it is not clear that LTI ever provided Peter with a time frame in which to respond. *See infra* Part V.D.3.

ployer that she had completed her portion of the UNICARE form and given it to the doctor; each time Hunsicker called, Peter told her the doctor's office had said they would send it out. Peter T52:18–53:4.

Courts have found circumstances like those present in this case to trigger the equitable provision of the FMLA regulations. In *Uema v. Nippon Exp. Hawaii, Inc.*, for example, the employee's doctor had gone on vacation for two weeks, precluding him from submitting requested medical documentation to his employer. 26 F.Supp.2d 1241 (D.Haw.1998). The court found that a jury could reasonably decide that the employee's failure timely to provide medical certification was impracticable despite his diligent good faith efforts to do so. *Id.* at 1248.

Similarly, when an employee's ailing wife required a mastectomy in Colombia, her Colombian doctor's failure to return the FMLA forms required by the employer to allow the employee to take leave to visit her was deemed a circumstance a reasonable jury could find made compliance with his employer's demands impracticable, despite his good faith efforts to comply. *Toro v. Mastex Indus.*, 32 F.Supp.2d 25, 29 (D.Mass.1999). In that case, the employee told his employer the forms had been sent to the Colombian physician and left the keys to his mailbox with a family member in order to allow her to give the forms to his employer upon their arrival. *Id.* at 27.

In both of these cases, the employee was terminated before the employer received their medical certification, and in both cases, the court found that the delay was not for lack of the employees' diligent, good-faith efforts, and that a jury could reasonably find that they had returned the forms as soon as was practicable under the circumstances. *Also Chenoweth v. Wal–Mart Stores, Inc.*, 159 F.Supp.2d 1032, 1039 (S.D.Ohio 2001) (equitable provision

triggered when employee's spouse's physician could not complete the form and home health aide delayed until after employee was terminated). We are persuaded that in this case, Peter has produced sufficient evidence of her good-faith efforts to provide the medical certification requested by LTI that a jury could reasonably find that it was impracticable under the circumstances to provide it in a timely manner.

Peter has testified that she completed her portion of the UNICARE form and dropped it off at Dr. Galgon's office on June 1, 1999, the same day she received and signed it. Peter T85:15–20. At that time, she specifically informed Dr. Galgon that the forms had to be completed. Peter T85:4–14. Although Dr. Galgon told her he intended to mail the forms that very day, Peter T84:11–13, he did not immediately complete and return them. Hunsicker called Peter "at least twice a week" during the month of June to "request paperwork that I had mailed out to her and following up [sic] on returning the paperwork." Hunsicker 10:19–23 (Peter recalls that Hunsicker spoke to her at least three times during this period. Peter 52:6–7, 89:17–22). After each conversation, Peter called Dr. Galgon's office to determine the status of her paperwork. Each time she called, she was told that the doctor was presently unavailable but that the forms would be completed and mailed by the end of the week. Peter T53:9–13, 86:11–17. The only occasion on which she was able to speak directly to the doctor was after she received Hunsicker's penultimate letter on June 25, 1999. Peter T86:18–87:2. Dr. Galgon signed and mailed the forms the same day. SJ Mot. Ex. K.

Although it is true that Peter never went to her doctor's office to pick up the forms by hand, Peter T89:6–10, nothing in the regulations or case law suggests that good-faith diligence would have required

her to do so, especially in light of the fact that LTI never informed her that her job was at stake. Peter T54:1–24. A jury could reasonably find that Peter's reliance on Dr. Galgon's office's assurances that the form would be mailed, coupled with her weekly communication with LTI, constituted sufficient good-faith diligence to excuse her delay in providing the requested medical certification.

### 3. Did LTI Satisfy Its Obligations as an Employer Under the FMLA?

■ Plaintiff has alleged that LTI did not provide her with a reasonable opportunity to submit her documentation, in violation of the FMLA. Complaint at ¶ 33. LTI's summary judgment motion implicitly addresses this claim with the argument that Peter did not submit her medical documentation despite repeated requests to do so, an argument with which we have just dealt. However, Plaintiff's allegation and Defendant's motion raise a subsidiary issue with which neither party deals directly, that of whether LTI ever complied with its obligations to advise Peter of the consequences of a failure to provide certification or to provide her a timeframe in which to do so. 29 C.F.R. § 825.305 (2000). Even if we had found, *supra*, that Peter unjustifiably delayed her response to LTI's request for medical certification, we still would not grant LTI's motion because her "delay" must be viewed against the deadline that she was supposed to meet. Because LTI never gave Peter a deadline for submitting her documentation, it would be impossible to conclude that Peter had actually delayed beyond a reasonable point. Moreover, the "particular circumstances" under which Peter was operating

must be read to include her knowledge of the consequences of delay, and LTI never told her that she would lose her job if she did not provide her documentation by a certain time (or at all). LTI's failure to provide Peter with either a deadline or notice that she might be terminated could reasonably form the basis of a jury decision that LTI unlawfully interfered with Plaintiff's rights under the FMLA, and for this additional reason, we refuse to grant summary judgment to Defendant.

■ LTI does not dispute that it never gave Peter a definite date by which she had to provide the requested medical certification. SJ Mot. at 32 ("it is undisputed that Plaintiff was advised in writing that she was required to submit a medical certification as soon as possible"). The letter sent by LTI to Peter on March 2, 1998 explaining her rights and obligations under the FMLA contains no mention of the time frame within which an employee must provide requested medical certification. SJ Mot. Ex. C. Similarly, the single page from the "New Employee Kit" provided by Defendant is merely a table of contents, and gives no indication that new employees were informed of the deadline for submitting FMLA medical certifications.[9] SJ Mot. Ex. B. Peter testified that Hunsicker told her only that she should get the completed forms to LTI as soon as possible. Peter T54:21–24. The failure of an employer to provide notice of when medical certification is due goes to whether it met its notice obligations under the FMLA. *Marrero*, 164 F.Supp.2d at 466; *Rager*, 210 F.3d at 776 ("[An] employer is required to notify the employee promptly and in writing of the 15–day deadline").

---

**9.** It is true that, as Defendant points out, the UNICARE disability claim form eventually completed by Peter and Dr. Galgon specifies that it should be returned to the employer within ten days. SJ Mot. at 32; SJ Mot. Ex. K. However, this fact is certainly not helpful and

may even be hurtful to LTI's position, since the FMLA requires that an employee be given at least *fifteen* days in which to provide any requested medical certification. 29 C.F.R. § 825.305(b).

In this case, plaintiff has produced enough evidence to require a jury to determine whether LTI ever provided a deadline and, therefore, whether LTI could lawfully follow through with Peter's termination.

LTI also does not dispute that it never told Peter she could be fired for failing to provide a certification from Dr. Galgon. SJ Mot. 32–33. Hunsicker testified that she told Peter that the reason the UNI-CARE and FMLA forms were required was to determine whether she was qualified for either disability or FMLA leave. Hunsicker T14:23–15:1. Peter testified that nobody at LTI ever told her she could be fired if she did not complete her disability and FMLA forms by a certain time. Peter T54:15–24. Defendant points out that at least one court has found that an employer may take an adverse employment action not specifically enumerated in its obligations and consequences notice to an employee. *See Henthorn v. Olsten Corp.*, No. 97 C508182, 1999 WL 102764 (N.D.Ill. Feb. 24, 1999), 1999 U.S. Dist. LEXIS 2029. However, other courts have found that evidence that an employer neglected to inform an employee that failure to provide adequate medical certification could result in termination could lead a jury reasonably to conclude that the employer has interfered with the employee's FMLA rights. *Chenoweth*, 159 F.Supp.2d 1032, 1039; *See also Wilson*, 159 F.Supp.2d at 194 (employer's failure to comply with notice requirements of the FMLA made unlawful employer's determination that employee had quit after taking undocumented leave.) Given this Circuit's solicitousness towards plaintiffs at summary judgment in employment discrimination cases, *Goosby*, 228 F.3d at 321, we are inclined to adopt the latter approach.

■ LTI makes a final argument with regard to the sufficiency of the medical certification that Dr. Galgon did eventually provide. Defendant's position is that be-cause Dr. Galgon's medical certification indicated Peter would require "indefinite" leave, it does not comply with the FMLA regulations' requirement that such certifications specify "the probable duration of the patient's present incapacity." *See* 29 C.F.R. § 825.306(b)(2)(i). Even if it is true that the notation "indefinite" does not satisfy this criterion of the regulations, the fact remains that the proper course of action for an employer who receives inadequate medical certification is not termination. Instead, such an employer is under an obligation to provide the employee with a reasonable time in which to correct or amend their medical certification. *Marrero*, 164 F.Supp.2d at 466. Indeed, the FMLA regulations provide that where an employee provides inadequate or incomplete medical certification, the employer must give her a reasonable opportunity to perfect any deficiencies. 29 C.F.R. § 825.305(d). Thus even if Peter's medical certification could be considered inadequate, LTI was not justified in firing her for that reason, and we deny summary judgment on this point.

In sum, Peter has put forward enough evidence to allow a jury reasonably to find that the amount of time she was given to submit her FMLA medical certification, LTI's failure to warn her of her possible termination and LTI's failure to provide a definite deadline, constitute interference with Peter's FMLA rights. We therefore decline to grant summary judgment to LTI on Peter's FMLA interference claim.

E. *Plaintiff's FMLA Discrimination Claim*

Peter also alleges that LTI discriminatorily terminated her in retaliation for her attempt to obtain FMLA leave, in violation of 29 U.S.C. § 2615(a)(2). As with other claims of discrimination, retaliation claims under the FMLA are to be analyzed under the framework of *McDonnell Douglas*

*Corp., supra,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668. *Williams v. Shenango,* 986 F.Supp. 309, 318 (W.D.Pa.1997); *Holmes v. Pizza Hut of America, Inc.,* No. CIV.A.97–4967, 1998 WL 564433, at *7 (E.D.Pa. Aug.31, 1998); *see also Hodgens v. General Dynamics Corp.,* 144 F.3d 151, 159 (1st Cir.1998). This "shifting burdens of proof" framework requires: first, that the plaintiff establish a *prima facie* case of employment discrimination; second, that the employer proffer a nondiscriminatory reason for its adverse employment action; and third, that the plaintiff must then show that the employer's proffered explanations were pretextual. *Sheridan v. E.I. DuPont de Nemours and Co.,* 100 F.3d 1061, 1065–67 (3d Cir.1996).

The plaintiff's prima facie case under section 2615(a)(2) requires a showing that (1) she is protected under the Act, (2) she suffered an adverse employment action, and (3) a causal connection exists between the adverse decision and plaintiff's exercise of his or her FMLA rights. *Baltuskonis v. U.S. Airways, Inc.,* 60 F.Supp.2d 445, 448 (E.D.Pa.1999). We have already found that Peter has produced sufficient evidence to demonstrate that she was protected under the FMLA, *see supra* Part V.D, and neither party disputes that Peter's termination is an adverse employment action. Although Defendant purports to dispute the third element of Peter's prima facie case, its own repeated admission that she was terminated because she failed to show up for work without providing medical certification clearly demonstrates a causal connection between Plaintiff's leave and her adverse employment action. If Plaintiff succeeds at trial on her interference claim, then her prima facie case as to her retaliation claim will also be satisfied.

Assuming that this is the case, the analysis moves to the *McDonnell Douglas* burden-shifting approach. Under this framework, LTI must come forward with a non-discriminatory reason for its termination of Peter's employment. LTI insists that it did not fire Peter because she requested FMLA leave, but rather because she stopped coming to work without providing adequate medical certification. Hunsicker testified that the sole reason for Peter's termination was that she had not returned the forms. Hunsicker T21:21–22:1. Kuntz testified that the reason she decided to fire Peter was that she had neither complied with requests for the FMLA paperwork nor returned to work. Kuntz T28:16–19. Even if this reason were not arguably pretextual, and it is, it would not be legally sufficient to warrant granting of summary judgment to LTI. Again, assuming that Plaintiff succeeds in demonstrating her interference charge, which necessarily proves the prima facie case for her discrimination/retaliation charge, it is clear that LTI terminated her employment precisely because of her allegedly-FMLA-protected absences. FMLA-protected absences may not lawfully be considered in deciding whether to terminate an employee for excessive absenteeism. *Marrero,* 164 F.Supp.2d at 466; *Viereck v. City of Gloucester City,* 961 F.Supp. 703, 708 (D.N.J.1997).

There is also sufficient evidence in the record for a reasonable jury to conclude that LTI's claimed rationale for terminating Peter is merely pretextual.[10] First, if LTI's only reason for terminating Peter was her excessive absenteeism, one might

**10.** Plaintiff makes no argument in brief and points to no facts which might paint as pretextual Defendant's proffered reason for terminating her. Nevertheless, we conduct an independent examination of Defendant's mo-

tion on this claim. *See Lehigh Valley Health Network,* 2001 WL 21505;, 2001 U.S. Dist. LEXIS 73; *See* U.S. Dist. Ct. E.D.Pa. L.R. Civ. P. 7.1(c).

reasonably expect that they would determine, before firing her, if she had sufficient vacation days and sick leave to cover her absence. One might reasonably assume that an employer's standard policy prior to terminating an employee for excessive absenteeism would be to make such a determination. In this regard, LTI comports with our reasonable assumption—LTI has a form called an employee checklist that allows an administrator to make this calculation. *See* Kuntz T45:7–16. However, LTI never made any determination as to how much vacation time or sick leave Peter had left. Kuntz T44:12–45:6. Thus it had no way of knowing whether Peter's absenteeism was excusable on grounds other than disability or FMLA leave. This oddity becomes all the more striking upon the revelation that in opposing Peter's unemployment compensation claim, LTI originally indicated that Peter had voluntarily quit because of health reasons but then "scratched out" this response and chose "other" instead. Kuntz T47:14–48:13.

From these facts, as well as LTI's admitted knowledge of plaintiff's illness during her leave (based on their several phone calls to follow up on the FMLA forms), a jury could reasonably determine that LTI terminated Peter because she had taken FMLA-eligible leave. We therefore decline to grant summary judgment to LTI on Peter's discrimination/retaliation claim under the FMLA.

## VI. Conclusion

Plaintiff raises a triable issue of fact as to whether she was improperly denied medical leave under the FMLA and subsequently fired for attempting to obtain such leave. Defendant's summary judgment motion is granted as to all other bases and causes of action. This matter will proceed to trial in a manner consistent with the foregoing.

### *ORDER*

AND NOW, this 7th day of October, 2002, after considering Plaintiff's Motion for Reconsideration, filed September 30, 2002, and Defendant's letter memorandum in opposition thereto, filed October 4, 2002, it is hereby ORDERED that Plaintiff's motion be DENIED for the following reasons.

 Plaintiff filed her motion nearly a month after we issued our decision in this case, well beyond the 10 day period allowed by Rule 59(e) of the Federal Rules of Civil Procedure and Rule 7.1(g) of the Eastern District of Pennsylvania Local Rules of Civil Procedure.[1] Moreover, Plaintiff raises as "new evidence" evidence that was fully available to her at the time she filed her Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment on August 12, 2002. Further, in that memorandum, as we noted in our Memorandum and Order dated August 29, 2002, Plaintiff made neither legal nor factual argument in opposition to Defendant's contention that her EEOC filing was not timely. Indeed, the only evidence in the record from the Plaintiff's side relevant to this issue was Plaintiff's own statement at her deposition that July 11, 2000 was the date her EEOC charge was filed. Deposition of Robin L. Peter 92:17–94:10. Finally, the "new evidence" Plaintiff puts forward in support of her Motion for Reconsideration is neither accompanied by an affidavit nor verified as to its source, as

---

1. This District's Local Rules of Civil Procedure indicate that where a motion for reconsideration will not change the substantive result of a decision, the 10–day rule does not apply. Comments to E.D.Pa. Local R. Civ. P. 7.1, comm. 6(a). For that reason, we do not refuse to hear this motion on the basis of timeliness alone. *Cf. Grand Entertainment Group v. Star Media Sales,* 787 F.Supp. 458, 464 (E.D.Pa.1992) (denying motion to reconsider as untimely).

required by Rule 56 of the Federal Rules of Civil Procedure.[2]

We note, further, that even were we to grant Plaintiff's motion, the disposition of her ADA claim would not change. As we found in our Memorandum and Order of August 29, 2002, Plaintiff has failed to establish a prima facie case for her ADA claim, and even if we altered our decision as to whether that claim is time-barred, for substantive reasons it would still be dismissed. Given that Plaintiff's counsel did not take advantage of the opportunity to offer the evidence offered here in Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment, and given Plaintiff's counsel's dilatory conduct since then, and given, further, that the substantive outcome would not change, we decline to grant Plaintiff's Motion for Reconsideration. *See Continental Casualty Co. v. Diversified Indus.*, 884 F.Supp. 937, 943 (E.D.Pa.1995) ("Because federal courts have a strong interest in the finality of judgments, motions for reconsideration should be granted sparingly.")

---

**2.** We do note that the date stamps on the documents provided do appear to indicate receipt by the EEOC's Philadelphia office on January 28, 2000.